Tsimpedes Law Firm
By: Athan Tsimpedes, Esq.
1920 N Street, NW
Suite 300
Washington, DC 20036
Tel:  202-464-9910
Fax: 202-747-2947
athan@tsimpedeslaw.com
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE STATE OF NEW JERSEY

| | |
|---|---|
| **BERNARD B. KERIK**<br>905 Old Mill Road<br>Franklin Lakes, New Jersey 07417<br><br><br>**Plaintiff,**<br><br>**vs.**<br><br>**JOSEPH TACOPINA, ESQ**<br>Tacopina Seigel & Turano, P.C.<br>275 Madison Avenue<br>New York, New York 10016, and<br><br><br>**MICHAEL S. ROSS, ESQ.**<br>One Grand Central Place<br>60 East 42nd Street<br>Forty-Seventh Floor<br>New York, New York 10165<br><br><br>**Defendants.** | *Civil Action:*<br><br><br><br><br><br><br><br><br><br><br><br>**VERIFIED COMPLAINT and<br>JURY DEMAND**<br><br>**with**<br><br>**AFFIDAVIT OF MERIT<br>pursuant to N.J.S.A. 2A:53A-27** |

COMES NOW Plaintiff, Bernard B. Kerik, by and through counsel, Athan T. Tsimpedes, Esq. and Complains of the Defendants, Joseph Tacopina Esq. and Michael S. Ross, Esq. as follows:

1

## INTRODUCTION

2

3        This is an action for legal malpractice against Joseph Tacopina Esq.

4  for false and misleading representations regarding a plea allocution/agreement that resulted in

5  substantial and/or irreparable harm to Plaintiff. Defendant Tacopina represented that no harm

6  would result in order to lure Mr. Kerik into accepting a plea of guilty under what Defendant

7  Tacopina described as "a violation, no different than pissing on the sidewalk," with no

8  repercussions, was in fact the catalyst to federal criminal charges on taxes specifically

9  represented by Tacopina would not arise from taking the plea in the Bronx case.  Defendant

10 Tacopina continue his harm towards Plaintiff through secreted meetings with federal

11 prosecutors where privileged information and/or false information was exchanged and provided

12 against the interest of his client, Mr. Kerik while simultaneously concealing the fact that

13 Defendant Tacopina himself was a subject or target of an ongoing federal criminal

14 investigation.

15

16        This is also an action against Michael S. Ross, a prominent ethics lawyer in New York,

17 operating under the law offices of Michael S. Ross, for aiding and assisting in the intentional

18 production of privileged information to federal prosecutors against the interest of Mr. Kerik by

19 aiding and counseling Defendant Tacopina to do so in violation of the standards of ethical and

20 legal practice, without providing any notice of their intent to so.  These epic failures occurring

21 one after another are not mistakes or coincidences as these Defendants are seasoned prominent

22 attorneys.  The failure to notify Mr. Kerik (to obtain separate counsel) prior to divulging to

23 prosecutors is epic because it would have allowed the opportunity to seek court intervene to

24 enjoin the release of that information that was then used against Mr. Kerik. Defendant Ross

25 knew his client Defendant Tacopina was talking to federal prosecutors and/or investigators and

26 provided them privileged, misleading or false information regarding Mr. Kerik, that would harm

his ability to mount a defense and/or jeopardize the liberty interests but never gave the courtesy of prior notice to Mr. Kerik so he may take protective measures.

The privileged information whether or not factually accurate by Defendant Tacopina, was material and relevant to Mr. Kerik's defense of the criminal charges being prosecuted by the same United States Attorney's Office ("USAO") in the Southern District of New York and federal prosecutors meeting with Defendant Tacopina in secret described in an affidavit attached as an exhibit.  Defendant Ross' sudden and secret appearance provided the perfect cover to maliciously and flagrantly violate the rights and disclose otherwise protected and privileged information belonging to Plaintiff that was purged without any concern.

These wrongful actions followed on the heels of Defendant Tacopina's negotiated plea allocution/agreement of Mr. Kerik that precipitated the federal investigation and charges against Mr. Kerik.  Defendant Tacopina had Mr. Kerik and his wife believe the plea agreement had no prospective effect towards the liberty interest of Mr. Kerik and certainly no tax implications that was enough to induce Mr. Kerik to accept the plea at the time but turned out to be false and misleading to the detriment of Mr. Kerik and his family.

Defendant Tacopina did not stop his assault on Mr. Kerik there. In a shocking twist, Defendant Tacopina's secreted meetings divulging privileged former client information to the same federal prosecutors attacking Mr. Kerik landed him on a federal witness list against his own client. Although the court order provided that Defendant Tacopina as a federal witness could not contact Mr. Kerik, he did so anyway in flagrant disregard for the liberty interests of his client, ethical rules and by Court Order for the simple reason of greed to get a finder's fee that was also misrepresented to be split equally with Mr. Kerik but would actually net Defendant Tacopina $1 million dollars more.

After prosecutors informed Mr. Kerik's counsel about the secret meetings, Defendant

Ross did allow his client Defendant Tacopina to answer some questions informally in January 2008, but only if the questions were unrelated to discussions or meetings with federal prosecutors as a "gesture of cooperation" and not that Defendant Tacopina had a duty to cooperate with successor counsel seeking information to help in their representation of the very client he abandoned.  The "gesture of cooperation" by Defendants to federal prosecutors was quite different resulting in the disqualification of Mr. Kerik's then counsel, Kenneth Breen, Eq., based on Defendant Tacopina's statements to the federal prosecutors that interfered with Mr. Kerik's choice of counsel and ability to mount a defense.

### JURISDICTION AND VENUE

1.     This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. §1332.  Each Defendant is a citizen of a state different than that of the Plaintiff and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff also invokes the supplemental jurisdiction of this Court with respect to claims based upon the laws of the State of New Jersey, pursuant to 28 U.S.C. § 1367.

2.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 because at least one of the Defendants maintains offices and/or transacts business in New Jersey and/or the Defendants' wrongful acts or omissions relating to the claims giving rise to this action substantially or materially, in whole or in part, arise in New Jersey.

### THE PARTIES

3.     Plaintiff Bernard B. Kerik, is an adult male, married with children, residing at 905 Old Mill Road Franklin Lakes, New Jersey 07417.  Mr. Kerik is the former New York City Police Commissioner.

3.      Joseph Tacopina, Esq., an attorney at law of the State of New York, was the founding attorney of the Joseph Tacopina PC, and its successor in interest, Tacopina Seigel & Turano, P.C with his office located at 275 Madison Avenue, New York, New York 10016. Defendant Tacopina was responsible for the defense of Mr. Kerik regarding an investigation in the Bronx that ended with a drafted and negotiated plea agreement by Defendant Tacopina. Unfortunately for his client, the plea allocution was inexcusably the catalyst of a 16 count federal indictment for Mr. Kerik that substantially altered the lives of Mr. Kerik and his family.

4.      Defendant Michael S. Ross, (hereinafter "Ross") at all times material was an attorney at law in the State of New York at the Law Offices of Michael S. Ross, with his office located at 60 East 42nd Street Forty-Seventh Floor, New York, New York.  Defendant Ross secretly represented Defendant Tacopina before the US Attorney's Office in the Southern Division of New York (SDNY), during and after Defendant Tacopina's representation of Mr. Kerik, and knowing that at the time Defendant Tacopina was releasing information that was privileged and harmful to Mr. Kerik, and failed to inform Mr. Kerik in advance so he may have at least had the opportunity to take legal measures to stop it before it caused harm.

**FACTUAL ALLEGATIONS**

5.      Mr. Kerik the former New York City Police Commissioner, met Joseph Tacopina in 2002, and maintained a close personal relationship with him for several years.

6.      On December 3, 2004, President George W. Bush nominated Bernard B. Kerik as Secretary of the U.S. Department of Homeland Security.

7.      On December 10, 2004, Mr. Kerik withdrew his name from consideration for Secretary of the U.S. Department of Homeland Security that created media inquiries.

8.      Starting in December 2004, Mr. Tacopina began representing Mr. Kerik by responding to questions from the media soon after Mr. Kerik declined the nomination for the Secretary of the U.S. Department of Homeland Security.

9.      Soon thereafter, Defendant Tacopina informed Mr. Kerik that he was contacted by Walter Arsenault, the First Deputy Commissioner of the New York City Department of Investigation ("DOI") about an investigation regarding Mr. Kerik's conduct when he was the Commissioner of the Department Of Corrections ("DOC") between 1998 and 2001.

10.     Upon information and belief, Defendant Tacopina, then Mr. Kerik's attorney, met with representatives of the DOI, and the Bronx County District Attorney's Office ("BCDAO") to discuss some of the allegations it was investigating, relating to apartment renovations that Mr. Kerik had paid for an apartment in the Bronx, owned by Plaintiff and his wife, Hala.

11.     Prior to that meeting, Mr. Kerik met with Mr. Tacopina to give him the details of his payments for the renovations for the apartment, in sum and substance, what he remembered paying, and providing Mr. Tacopina with specifics amounts of checks and payments.

12.     According to Mr. Kerik, he told Mr. Tacopina that he and his wife paid between $30,000 - $50,000 for the renovations to a contractor by the name of Mr. Tim Woods, who was recommended by Mr. Frank DiTommaso, and personal friend of Mr. Kerik.

13.     Upon information and belief, from 2005 through 2006, the BCDAO and the DOI were jointly investigating Kerik's activities while he was Commissioner of DOC between January 1998 and August 2001 (hereinafter referred to as the "Bronx case").

14.     Upon information and belief, Plaintiff was under investigation in the Bronx for allegedly having corruptly intervened in a 1999 investigation by a city agency of Interstate

Industrial Corporation ("Interstate"), which at the time employed Kerik's brother and a friend of Kerik's named Larry Ray.

15.    A grand jury was empanelled (a date unknown at this time) to investigate and hear testimony about that subject, and possibly others, in the Bronx case.

16.    Upon information and belief, during the 2005-2006 the Bronx investigation, Walter Arsenault, then the First Deputy Commissioner at DOI, was the lead investigator in the Bronx criminal investigation against the Plaintiff and was cross-deputized as a Bronx Assistant District Attorney ("ADA"). In that role, Arsenault participated in preparing and examining grand jury witnesses.

17.    At some point thereafter, Defendant Tacopina on his own initiative recruited Kenneth Breen, Esq, and requested that Mr. Kerik hire Mr. Breen to assist Tacopina in defending  Mr. Kerik during the grand jury phase of the investigation in the Bronx case.

18.    Mr. Breen[1] worked with Defendant Tacopina and had drafted a joint legal letter sent to the Bronx prosecutor explaining among other things that the limitations period has run on any alleged crime and that the evidence of a crime is simply non-existent yet were willing to settle under certain terms  **(See Exhibit "A" - letter to Robert T. Johnson, District Attorney Bronx County from Joseph Tacopina and Ken Breen).**

19.    The Bronx case investigation consisted of examining the renovations and payment for renovations to the Kerik's jointly owned apartment located in the Bronx, NY.

20.    Mr. Kerik made clear to Defendant Tacopina that the total cost to Mr. Kerik and his wife in renovating the Riverdale Apartment was between $30,000 and $50,000.

21.    On or about March 4, 2006, Mr. Tacopina sent Mr. Kerik a copy of a purported report prepared by the New Jersey Attorney General in charge of the Gaming Commission

---

[1] Mr. Breen was under contract thereafter to defend Mr. Kerik.
[2] Any citation of New Jersey Professional Conduct or Ethics law herein shall also mean if applicable any New York Rules of Professional Conduct and Ethics Opinions.

(which looks like a complaint) and requested Mr. Kerik respond to the statements therein, which he did.  **(See Exhibit "B"-  NJ Gaming Responses by Mr. Kerik to Joe Tacopina)**

22.     On or about March 5, 2006, Mr. Kerik sent Defendant Tacopina his response to the New Jersey Gaming report with specific answers to questions relating to the payment for renovations of his apartment in the Bronx and a letter from Defendant Tacopina, who is not licensed in NJ, defending and representing his client in NJ **( See Exhibit "C"- letter from Joe Tacopina to NJ Attorney General)**

23.     On June 20, 2006, Mr. Tacopina ecstatically sent Mr. Kerik an email that read:

"we got everything we wanted...the 2 unclassifed...the no evid of agreement lanuage...the "believing interstate was clean" ...i got them to agree to u got some renovations paid for by interstate or ITS SUBSIDIERIES!!...(which could mean woods just never billed u!!)...NO GRAND JURY REPORT & NO DOI REPORT...ALL INVEST. By DOI closed!!

( asrsenault will have to get a life)....on friday june 30!!"

24.     Upon information and belief, Defendant Tacopina intentionally or with malice ignored his co-counsel, Mr. Breen, and concealed from him the email correspondence, the negotiations of the terms and representations into the plea allocution with the BDAO, that Defendant Tacopina touted as a "victory" and everything "we" wanted yet was deceptively astute not to share the news, the draft plea terms and allocution with Mr. Breen or have him involved in any of the plea negotiations by design. **(See Exhibit "D" – Plea Allocution/Agreement- From Joe Tacopina to Robert T. Johnson, District Attorney Bronx County -signed by Tacopina -dated June 20, 2006,)**

25.     On June 29, 2006, Mr. Kerik called Mr. Tacopina, and told him he felt uncomfortable saying that he accepted a gift from DiTommaso or Interstate, because he didn't know that to be a fact, and asked Mr. Tacopina if during his plea allocution, he could say he accepted a gift

from Woods Restoration ("WR") (who was actually responsible for the apartment renovations), Interstate or one of its subsidiaries', that he was not sure who paid for anything over the $30,000 that he paid  WR, which was the amount WR said the job would cost, and that Mr. Kerik was never sent another bill over what he was told the job would cost, and disagrees with WR's estimate of  costs were for the job.

26.     On June 30, 2006, on the strenuous advice and false representations of Mr. Tacopina regarding the negotiated plea allocution/agreement with the Bronx District Attorney's Office as stated herein and relied upon by Mr. Kerik, Mr. Kerik pled guilty to two ethics violations.

27.     During this time, Defendant Tacopina masterminded the plea allocution/agreement and its terms limited the knowledge and/or participation of Mr. Breen then sold Mr. Kerik down the river through a series of events reminiscent of the Godfather..

28.     Prior to and after accepting the terms of the plea agreement, Mr. Tacopina came to Mr. Kerik's home in New Jersey, and represented to Mr. Kerik and his wife, that Mr. Kerik's pleading guilty to the charges as drafted and negotiated by Defendant Tacopina would end any and all investigations against him, and that there would be no tax liabilities as a result of his plea (explaining and representing that the law provides that "a gift giver is responsible for any gift tax), and that Mr. Kerik and his family could move on with their lives. In reliance upon the representations by Defendant Tacopina who Mr. Kerik trusted, Mr. Kerik accepted the plea agreement.

29.     Upon information and belief, immediately after Mr. Kerik accepted the negotiated plea and pled guilty in state court on June 30, 2006, the DOI's lead investigator, and now Bronx prosecutor, Mr. Arsenualt sent letters to state and federal tax and law enforcement authorities, calling for investigations surrounding Mr. Kerik relating to the Bronx case.

30.     In or about July 2006, the U.S. Attorney's Office in the SDNY initiated a federal grand

jury investigation involving many of the issues that had been investigated, and resolved in the Bronx case.

31.     On or about March 12, 2007, the federal prosecutors involved in the grand jury investigation against Mr. Kerik served Mr. Tacopina with a grand jury subpoena, calling for the blanket production of records from his law firm relating to Bernard Kerik.

32.     As a result of this conveniently timed subpoena, Defendant Tacopina was allegedly conflicted from representing Mr. Kerik any further leaving only Mr. Breen representing Mr. Kerik, who immediately notified Defendant Tacopina to preserve his attorney/client work product protections and attorney-client privileges

33.     Between March 2007 and November 2007, Defendant Tacopina maintained constant contact with Mr. Kerik, insuring him a victory in his fight for justice and to stay strong..

34.     In or around September 2007, Mr. Tacopina requested the help of Mr. Kerik regarding a substantial business transaction between Mr. Tacopina and his friend and client, Mr. Raffaello Follieri, an Italian businessman.

35.     Defendant Tacopina told Mr. Kerik that he was representing Mr. Follieri in a real estate venture that required $100 million in funding, and if Mr. Kerik could assist in obtaining the funding, it would result in a $1.5 million finder's fee, that Defendant Tacopina and Mr. Kerik would split (hereinafter referred to as the "Follieri deal").

36.      In reliance on Defendant Tacopina's representations, Mr. Kerik used his resources to find a ready willing and able investor for the Follieri deal.

37.     On or about September 15, 2007, Mr. Kerik introduced Defendant Tacopina and Mr. Follieri to a representative of a Connecticut based hedge fund, Plainfield Assets, as a possible investor for the Follieri real estate deal.

38.     Between September 15, 2007 and mid-October 2007, Plainfield Assets agreed to fund the real estate project for Mr. Follieri.

39.     On the morning of November 5, 2007, Defendant Tacopina's requested Mr. Kerik meet with him at 94th Street near 23rd Avenue in Queens, New York. Defendant Tacopina then informed Mr. Kerik that Assistant U.S. Attorneys Elliott Jacobson and Perry Carbone were in the process of destroying his law practice, and that he thought he was going to lose his law license.

40.     At that meeting, Defendant Tacopina asked Mr. Kerik for his assistance again in obtaining funding for the acquisition of an Italian Soccer Team. During this conversation, Defendant Tacopina confirmed the finder's fee in the Follieri deal was $1.5 million, which the two of them would split.

41.     On November 8, 2007, three days later after Defendant Tacopina informed him of his troubles with the law, Mr. Kerik was indicted by a federal grand jury, on a 16-count indictment (**See Exhibit "E"– USAO NY Press Release dated November 9, 2007).**

42.     On November 15, 2007, Mr. Breen was provided a witness list by federal prosecutors, in which Joseph Tacopina was listed as a federal witness suggesting at least that Defendant Tacopina had provided some information to the federal prosecutors without the Mr. Kerik's knowledge contrary to his former client's liberty interests in. (**See Exhibit "F" – Government Witness List, Joe Tacopina witness No. 14).**

43.     Immediately thereafter, Mr. Breen contacted Defendant Tacopina and advised him that he was on the witness list, and that he was not to have any contact with Mr. Kerik going forward and to protect his interests.

44.     On or about November 30, 2007, Mr. Kerik learned from a representative of Plainfield Assets that the original finder's fee agreement in the Follieri deal was actually for $2.5 million and not $1.5 million as represented by Mr. Tacopina to him.

45.     On December 2, 2007, after Mr. Kerik expressed his concern to a mutual friend of Defendant Tacopina's misrepresentation about the $1 million discrepancy in the finder's fee, Mr. Tacopina sent Mr. Paul D'Emilia, an employee of Mr. Kerik, the following email:

> ➢ Paul.....just so you know the increase I got from follieri from 1.5 mm
>
> > to 2.5mm occurred after I was told I couldn't speak to BK right
>
> > now!!.....otherwise of course I would have told him myself....and let bk
>
> > know I am making follieri execute a personal guarentee.....and that I am
>
> > splitting everything with him even addt'l $ I worked into the deal.

46.     Sometime later, Mr. Kerik discovered that the original agreement with Mr. Follieri and Defendant Tacopina regarding the finder's fee, was indeed $2.5 million, and was signed on October 5, 2007.

47.     On or about December 9, 2007, despite instructions to stay away from Mr. Kerik, and that he was precluded from having any direct or indirect contact with Mr. Kerik by the court, Mr. Tacopina called Mr. Kerik at his home in New Jersey, jeopardizing Mr. Kerik's bail conditions and liberty interests.

48.     During this telephone conversation with Mr. Kerik on December 9, 2007, Mr. Tacopina also represented that 1) he knew Mr. Kerik was not getting a fee from Plainfield Assets, 2) that he told Mr. Follieri that half of the finder's fee was for Mr. Kerik, 3) that he told Mr. Follieri, "don't think I'm not going to go after that money to protect his fee, because I brought him into this thing," and 5) that Mr. Kerik "had as much of a claim against him

12

(Follieri) as I (Tacopina) do". Obviously, Defendant Tacopina has no problem creating conflicts even between his clients to avoid being caught in between the weight of his own misrepresentations.

49.     To this day, Defendant Tacopina continues to deny and conceal his motives and representation of the Follieri deal and has done so publicly.

50.     On December 28, 2013, in response to a New York Daily News article, Defendant Tacopina concealed his misrepresentations by denying on the record, that he had an understanding "either verbally or in writing, for Mr. Kerik to be part of any transaction, finder's fee or otherwise, with Follieri," and claimed that Kerik had a separate finder's fee deal with Plainfield.

51.     On or about December 6, 2007, it was revealed that Mr. Tacopina had met with federal prosecutors in secret, and divulged Mr. Kerik's alleged conversations with him related to the Bronx case that are considered privileged or non binding under the law.

52.     On December 17, 2007, federal prosecutors revealed that they had interviewed Defendant Tacopina, and that he confirmed statements he had made to the Bronx DA, and discussed his conversations with his client, Mr. Kerik that are privileged communications during the Bronx case.

53.     On or about January 23, 2008, Mr. Kerik's lawyers met with Defendant Tacopina and his attorney, Defendant Ross, regarding Mr. Tacopina's prior representation of Mr. Kerik, and his cooperation with the federal prosecutors.

54.     Defendant Tacopina's representations to Mr. Kerik are different than his representations alleged by federal prosecutors that raises serious concerns on many levels.

55.     The statements attributed to Mr. Kerik and provided to federal prosecutors by

13

Defendant Tacopina have credibility issues and red flags all around them as they were orchestrated in secret and without first informing his former client or obtaining his consent, which happened more than once that suggests this was not an accident.

56.     Had Defendant Tacopina or his counsel picked up the phone and called Mr. Kerik's counsel or Kerik as he did to find a finder's fee, Mr. Kerik could have at least brought the matter before the court to have an opportunity to enjoin the release of the actual statements or information Defendant Tacopina provided to federal prosecutors which to date is still sealed in the SDNY despite Mr. Kerik having paid his debt to society resulting from the Bronx case catalyst created by Defendant Tacopina.

58.     Without Defendants providing Mr. Kerik notice,  he was unable to seek the court's power to enjoin Defendant Tacopina from releasing privileged information, which had they so notified Mr. Kerik he could have moved to protect himself in court but sadly Mr. Kerik was never afforded that opportunity by Defendants.

59.     The tag team of Defendants' Tacopina and Ross, intended and did produce privileged material belonging exclusively to Mr. Kerik without court order, ruling or consent but contrary to the client's direct instruction by Mr. Breen.

60.     These epic failures  were not negligent but by design and calculated to destroy or limit Mr. Kerik's ability to mount a defense of the federal charges against him that finally came on November 8, 2008 on the heels and based on the plea in the Bronx case (**See Exhibit "E" - USAO NY Press Release regarding Bernard Kerik dated November 9, 2008)**.

61.     On or about January 23, 2008, Mr. Breen was disqualified as counsel for Mr. Kerik based on statements made by Defendant Tacopina with the assistance of Defendant Ross, knowing the statements would be so used by prosecutors against Mr. Kerik's choice of counsel and interfered with Mr. Kerik's ability to mount a defense.

14

62.     As a result of the conduct of the Defendants, Mr. Kerik required new counsel that placed him in a financial crisis from the attorney fees to mount his defense of 16 federal charges that became limited.

63.     Throughout the course of the attorney client relationship between Plaintiff and Defendant Tacopina, Defendant Tacopina recklessly and/or intentionally misrepresented the terms and the effects of his negotiated plea allocution/agreement in the Bronx case to lull Mr. Kerik into accepting the plea allocution/agreement specifically negotiated by Defendant Tacopina (one of the top attorneys in NY, if not the country).

64.      Defendant Tacopina represented to Mr. Kerik and his family can move on with no repercussions or tax liability by entering into the plea agreement, when in fact those representations were false and misleading.

65.     The Defendants' independent and joint conduct towards divulging privileged, false or inaccurate information to federal prosecutors to the detriment of the Plaintiff, knowing that his rights would be and were harmed, and would likely be harmed further, by never informing Mr. Kerik or his legal counsel in advance of such anticipated disclosures so they may take preventable measures or seek legal remedies at the time, were substantial factors in interfering with Mr. Kerik's choice of counsel and ability to mount a defense that led to the eventual incarceration of Plaintiff in that they each individually, negligently or intentionally failed in their duties assumed by virtue of their conduct or employ towards Mr. Kerik which they failed, thus causing Plaintiff to suffer  harm some of which may be irreparable.

66.     The negligence, carelessness, recklessness or maliciousness of each Defendant, at different times, towards Mr. Kerik were each substantial factors in causing damages including aggravating or causing the loss of liberty, loss of employment, substantial attorney fees, and/or issuance of federal criminal charges, economic damages, interfering with his ability

to mount a defense, federal and state taxes or charges arising from the false and deceptive plea allocution that led to the imprisonment of Mr. Kerik.

67.     By and through the conduct of Defendants, Plaintiff has sustained and continues to sustain economic and non-economic damages of an ongoing and permanent nature.  But for the negligence, malicious or intentional acts of Defendants, Plaintiff would have not: 1) accepted the plea agreement in the Bronx case, 2) been charged by federal prosecutors after the plea in the Bronx was entered, 3) pled guilty to federal charges consisting of mostly related tax crimes, 4) not have been incarcerated, 5)  received the lifelong stigma or label of a convicted felon, 6) lost the comfort of his wife and family, 7) lost his social and professional standing in the community and 8) lost his employment contracts based in the security field and 9) attorney fees and 10) non-economic damages.

## FIRST COUNT
### (Negligence)

68.     Plaintiff repeats and reiterates each of the allegations contained in the preceding paragraphs.

69.     As a result of the negligence of Defendants as aforesaid and as may otherwise be shown, Plaintiff sustained financial loss, damage and injury including the loss of employment, ability to secure employment, an inability to mount a defense, subsequent attorneys fees including compensatory damages and punitive damages, as well as attorneys' fees and costs.

70.     The negligence of Defendants, individually and jointly was a substantial factor in and thus the proximate cause of financial damage to Plaintiff for which the Defendants are liable pursuant to N.J.S.A. 2A:13-4.

**WHEREFORE,** Plaintiff demands judgment against each of the Defendants,

individually, jointly and severally, and in the alternative, for:

a.    Compensatory damages, including the negligence of the defendants herein;

b.    Punitive damages;

c.    Interest;

d.    Costs of suit;

e.    Attorneys' fees and reasonable expenses pursuant to *Saffer v. Willoughby*, 143 N.J. 256 (1996), <u>et</u> <u>seq</u>.;

f.    Disgorgement and return of attorney's fees paid.

## SECOND COUNT
### (Legal Malpractice)

71.    Plaintiff repeats and reiterates each of the allegations contained in the preceding paragraphs.

72.    The conduct of Defendants, as aforesaid was in breach of the professional duties owed by them to the Plaintiff, and constituted deviations from accepted standards of legal practice, so as to amount to legal malpractice.

73.    The deviations of Defendants, as aforesaid were the direct and proximate cause of and were a substantial factor in causing Plaintiff to sustain foreseeable financial damages including the inability to mount a defense for trial, secure a more favorable plea settlement or judgment including compensatory damages and punitive damages, for causing setting the criminal charges in motion and the resulting plea and incarceration which could have been avoided had Defendants individual and/or joint acts taken appropriate action rather than deviate from the applicable standard of care that includes but is not limited to, the duty to inform the client prior to divulging privileged information that belongs to the holder.

73.    The aforesaid deviations were egregious in nature and were in reckless

disregard of Defendants' professional duties and the legal interests and rights of their then client.

**WHEREFORE,** Plaintiff demands judgment against each of the Defendants, individually, jointly and severally, and in the alternative, for:

    a.    Compensatory damages including the punitive damages that would have been awarded to plaintiff in the underlying claim but for the negligence of the defendants herein;

    b.    Punitive damages;

    c.    Interest;

    d.    Costs of suit;

    e.    Attorneys' fees and reasonable expenses pursuant to *Saffer v. Willoughby*, 143 N.J. 256 (1996), <u>et</u> <u>seq</u>.;

    f.    Disgorgement and return of attorney's fees paid.

### THIRD COUNT
**(Breach of Fiduciary Duty)**

74.    Plaintiff repeats and reiterates each of the allegations contained in the preceding paragraphs.

75.    The conduct of Defendants constituted a breach of the fiduciary duty owed to Plaintiff, was careless and reckless and failed to comply with accepted standards of legal practice and further constituted a breach of fiduciary duty to Plaintiff, and a violation of N.J. RPC 1.4, 1.7 and other Rules of Professional Conduct and those standards set forth in the New Jersey Supreme Court's Advisory Committee on Professional Ethics, Opinion 684 or

applicable NY Rules of Professional Conduct and Ethics Opinions[2], in that Defendant wrongfully concealed that they had committed malpractice let alone ay wrongdoing which caused damage to the Plaintiff.

76.     The Defendants' law firms, and their managing members are also individually liable, in their roles as the managing attorneys who are responsible to take action to protect former or current client's from complying with illegal or invalid subpoenas, or otherwise refrain from providing information construed or understood to be privileged that if disclosed would likely cause harm and did. In particular failed to comply with accepted standards of care applicable to managerial attorneys in law firms specifically but not limited to the areas of docket and calendar control and in all other areas dealing with the supervision of the work of the attorneys and staff members in their law firm as such supervision affects the welfare of the legal rights of their clients and further, their actions were in violation of N.J. or NY Rules of Professional Conduct governing Supervisory Attorneys

77.     As a direct and proximate result of the aforesaid, Plaintiff

78.          **WHEREFORE,** Plaintiff demands judgment against each of the Defendants, individually, jointly and severally, and in the alternative, for:

a.     Compensatory damages including the punitive damages that would have been awarded to plaintiff in the underlying claim but for the negligence of the defendants herein;

b.     Punitive damages;

c.     Interest;

d.     Costs of suit;

e.     Attorneys' fees and reasonable expenses pursuant to *Saffer v. Willoughby*,

---

[2] Any citation of New Jersey Professional Conduct or Ethics law herein shall also mean if applicable any New York Rules of Professional Conduct and Ethics Opinions.

143 N.J. 256 (1996), <u>et</u> <u>seq.</u>;

f.  Disgorgement and return of attorney's fees paid.

**FOURTH COUNT**
**(Negligent Misrepresentation)**

79.  Plaintiff repeats and reiterates each of the allegations contained in the preceding paragraphs.

80.  The conduct of Defendants as set forth above constituted professional negligence, in that they negligently, carelessly and recklessly misrepresented to the plaintiff the true status of her claim, in violation of accepted legal standards and in violation of such standards set forth in N.J. Rules of Professional Conduct 1.4, 1.6, 1.7 and others as well as in Opinion No. 684 of the Advisory Committee on Professional Ethics of the Supreme Court of New Jersey.

81.  As a direct and proximate result of the aforesaid, Plaintiff was caused to sustain damages as aforesaid.

**WHEREFORE,** Plaintiff demands judgment against each of the Defendants, individually, jointly and severally, and in the alternative, for:

a.  Compensatory damages including the punitive damages that would have been awarded to plaintiff in the underlying claim but for the negligence of the defendants herein;

b.  Punitive damages;

c.  Interest;

d.  Costs of suit;

e.  Attorneys' fees and reasonable expenses pursuant to *Saffer v. Willoughby*, 143 N.J. 256 (1996), <u>et</u> <u>seq.</u>;

f.      Disgorgement and return of attorney's fees paid.

## FIFTH COUNT
### (Punitive Damages)

82.     Plaintiff repeats and reiterates each of the allegations contained in the preceding paragraphs as though fully set forth herein.

83.     Because of the wanton and willful conduct of Defendants, at various times individually and sometimes in concert, in covering up their malpractice as aforesaid, and in failing to protect Plaintiff's legal rights and further in covering up his delicts, thereby misleading the Plaintiff that his legal rights were being properly protected when in fact they were not, thereby preventing Plaintiff from taking any preventative or remedial action during Defendant's representation, including replacing him and his law firm with competent employment law counsel,   Plaintiff is entitled to recover exemplary and punitive damages from the Defendants pursuant to N.J.S.A. 2A:15-5.9

**WHEREFORE**, Plaintiff demands Judgment for Punitive Damages in a sum consistent with the provisions of N.J.S.A. 2A:15-5.9 et seq.

## SIXTH  COUNT

### (Fraudulent Disclosure, Concealment/Destruction and/ Spoliation of Evidence/Civil Conspiracy and Aiding and Abetting Breach of Fiduciary Duty)

84.      Plaintiff repeats and reiterates each of the allegations in the preceding paragraphs as they pertain to this cause of action as though more fully set forth at length herein.

85.     Upon information and belief, between 2006 through 2009 Plaintiff's former lawyer, Defendant Tacopina met with Defendant Ross, his attorney, to discuss divulging and providing privileged confidential and/or false or misleading information to Plaintiff.

86.     Upon information and belief and consistent with applicable standards of care, at the  aforesaid meetings, Ross and/or Tacopina would have been required to inform Mr. Kerik

and his then counsel, if not the court, to seek and obtain separate counsel, or to enjoin Defendants, and to protect Mr. Kerik's interests because Tacopina was going to assist the US Attorneys prosecuting the case against him in violation of Mr. Kerik's private and constitutional rights.

87.     Upon information and belief, at said meeting, Defendant Tacopina informed ? Defendant Ross that he was in possession of Plaintiff's privileged records and statements that if divulged without allowing Plaintiff Kerik to enjoin their clandestine actions that Mr. Kerik would be harmed and was.  Defendants however never did inform Mr. Kerik or his counsel, and continued to refuse to notify Mr. Kerik or his counsel to take necessary steps in advance to protect the disclosure of privileged information produced before or during meetings with the USAO that was prosecuting Mr. Kerik at the time.

88.     At the aforesaid meeting(s), when Defendant Ross was advised of the purpose of  said meeting, as the attorney for Defendant Tacopina, he had a duty to inform Mr. Kerik (Defendant Tacopina's current or former client at the time) and his counsel of the anticipated release of privileged information to the USAO NY Southern District office prior to its release, that he then and there knew and had reason to know that it was relevant and material evidence in connection with charges issued against Mr. Kerik, his defenses or interests, against his client.

89.     In violation of his duty as an attorney at law and officer of the Court, he failed to then and there withhold production of documents , statements or to otherwise instruct his client of his legal obligation to preserve and protect the  Plaintiff's rights and privileged from communications that included speaking clandestinely with federal prosecutors and voluntarily turning over privileged information regarding Mr. Kerik that interfered with his ability to mount a defense.

90.     As a result of his violation of that legal duty, he permitted and participated in the

fraudulent concealment, spoliation and/or destruction of material and relevant evidence that Plaintiff had an absolute legal right to protect either then and there or prior to their at some time in the future.

91.     Upon information and belief and in violation of Defendants' duty to protect privileged communication from being released to the USAO in NY by first informing Mr. Kerik of the intent to do so, with sufficient time to take protective action but did not.

92.     Upon information and belief, this conspiracy was formed and carried out by Defendants to intentionally conceal their conduct and to produce privileged information that may or may not be accurately or truthfully provided by Defendant Tacopina, to help federal prosecutors against the interests and rights of his client and knowingly doing so under the watchful eye and assistance of Defendant Ross.

93.     On or about January 23, 2008, Mr. Breen was disqualified as counsel for Plaintiff.

94.     To date, Defendants have failed to give a written description or accounting of

what was secretly divulged to the USAO in NY regarding Mr. Kerik.

95.     As a result of Defendants' fraudulent concealment, unlawful withholding and/or altering and/or destruction of Plaintiff's privileged information and related documents, Defendants' have formed a civil conspiracy to divulge, withhold and/or alter and/or destroy same, which conspiracy appears to have been formed sometime in 2007, at the aforesaid meetings with Defendants, prior to and during meetings with federal prosecutors which conspiracy persists to this date.

96.     Plaintiff has now sustained actual damage and has been seriously and unfairly prejudiced by Defendants conduct as stated herein, thereby causing Plaintiff substantial financial damage.

97.     Defendants have conspired to fraudulently disclose, create, conceal, destroy and/or spoliate evidence with the intent to damage Plaintiff.

98.     By reason of this fraud, collusion and conspiracy, Defendant Ross, although not the attorney for Plaintiff,  is nonetheless liable to him for all of his damages sustained as a result of his violation of standards of care applicable to attorneys.

99.     By reason of the foregoing, Defendants Tacopina and Ross aided and abetted the breach of fiduciary duty that Defendant Tacopina owed to Plaintiff during the course of his representation and continued therafter while remaining the holder of the privilged information.

WHEREFORE, Plaintiff seeks damages on this Count of the Complaint against Defendants, Individually, jointly and severally for :

    a.    Compensatory damages including but not limited to attorney fees, the loss of liberty for 36 months, punitive damages that would have been awarded to plaintiff in the underlying claim but for the negligence of the defendants herein;

    b.    Punitive damages;

    c.    Interest;

    d.    Costs of suit; and for such other legal and equitable relief to which under the foregoing facts and circumstances she may be entitled to receive.

### SEVENTH COUNT
### (Punitive Damages)

100.     Plaintiff repeats and reiterates each of the allegations contained in the Sixth Count of the Complaint as though more fully set forth at length herein.

101.     Because of the foregoing civil conspiracy between and among the Defendants as aforesaid which conspiracy was designed to deprive Plaintiff of his liberty interests and because such conspiracy was entered into by the Defendants with that specific intent and purpose, and

24

because Plaintiff has been caused actual damage by said conspiracy, Plaintiff is entitled to recover exemplary and punitive damages from the Defendants pursuant to <u>N.J.S.A.</u> 2A:15-5.9.

**WHEREFORE**, Plaintiff demands Judgment for Punitive Damages in a sum consistent with the provisions of N.J.S.A. 2A:15-5.9 et seq.

**EIGHTH COUNT**
**<u>Breach of Contract</u>**
**<u>Kerik v. Tacopina (Follieri Deal)</u>**

102.     Plaintiff repeats and reiterates each of the allegations in the preceding paragraphs as they pertain to this cause of action as though more fully set forth at length herein.

103.     Defendant failed to fulfill obligations owed to Plaintiff as stated in the Follieri deal that includes the covenant of good faith and fair dealing implied in every contract.

104.     Defendant is in breach of the Contract or otherwise breached the implied covenant of good faith and fair dealing implied in every contract.

105.     Plaintiff has suffered damages and continues to suffer damages as a result of said breach.

WHEREFORE, Plaintiff demands that a judgment be entered against Defendant TACOPINA for damages, attorneys' fees, pre-judgment interest and all other relief deemed just and proper.

**NINTH COUNT**
**<u>Intentional Misrepresentation</u>**
**<u>Kerik v. Tacopina</u>**

106.   Plaintiff repeats and reiterates each of the allegations in the preceding paragraphs as they pertain to this cause of action as though more fully set forth at length herein.

107.     Defendant's intentional misrepresentations were made to Plaintiff.

108.     Defendant intended that Plaintiff act or rely upon the intentionally false statements.

109.     Defendant knew or should have known that Plaintiff would rely upon the

intentionally false statements, which, if erroneous, would cause damage to Plaintiff.

110.    Plaintiff justifiably relied upon the Defendant's statements and assertions.

111.    As a result of Defendants' intentional acts, Plaintiff was harmed and incurred damages.

WHEREFORE, Plaintiff demands that a judgment be entered against Defendant for compensatory damages, punitive damages, attorneys' fees, pre-judgment interest and all other relief deemed just and proper.

### TENTH COUNT
### Fraud in the Inducement
### Kerik v. Tacopina- (plea agreement in the Bronx case)

112.    Plaintiff repeats and reiterates each of the allegations in the preceding paragraphs as they pertain to this cause of action as though more fully set forth at length herein.

113.    Defendant's intentional or malicious misrepresentations were made to Plaintiff while under a fiduciary duty to Plaintiff.

114.  Defendant intended that Plaintiff act or rely upon the intentionally false statements.

115.    Defendant knew or should have known that the misrepresentations were false.

116.    Defendant intended that the representation would induce Plaintiff to rely and act on them.

117.    Defendant knew or should have known that Plaintiff would rely upon the intentionally false statements, which, if erroneous, would cause harm and damage to Plaintiff.

118.    Plaintiff justifiably relied upon the Defendant's statements and assertions.

119.    As a result of Defendant's intentional acts, Plaintiff was harmed and incurred damages.

WHEREFORE, Plaintiff demands that a judgment be entered against Defendant Tacopina for

compensatory damages, punitive damages, attorneys' fees, pre-judgment interest and all other relief deemed just and proper.

**ELEVENTH COUNT**
**(Intentional Interference with Business Relationship/Contract)**
(Kerik v. Tacopina/Ross- Disqualification of Ken Breen, Esq)

120.   Plaintiff repeats and reiterates each of the allegations in the preceding paragraphs as they pertain to this cause of action as though more fully set forth at length herein.

121.    Defendants acted maliciously or intentionally in derogation of the rights of Plaintiff, as stated supra.

122.    Defendants' conduct was calculated to cause harm to Plaintiff by affecting his attorney client relationship with Kenneth Breen, Esq and his defense, that resulted in the disqualification of Mr. Breen on or about January 23, 2008.

123.    Defendants' conduct were committed with the unlawful or improper purpose to cause such damage, without justification, and with actual damage resulting to the Plaintiff

WHEREFORE, Plaintiff demands that a judgment be entered against each of the Defendants, individually, jointly and severally, for compensatory damages, punitive damages, attorneys' fees, pre-judgment interest and all other relief deemed just and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff hereby demands a trial by jury as to all issues.

**<u>CERTIFICATION</u>**

I hereby certify that the matter in controversy is not the subject of any other court, arbitration or administrative proceeding.

_____
Athan Tsimpedes

1

2

3

4

5   Respectfully submitted,

6

7   TSIMPEDES LAW FIRM
    *Attorneys for Bernard B. Kerik*

8

9

10  By:

11      Athan T. Tsimpedes, Esq
        1920 N Street, N.W.
12      Suite 300
        Washington, D.C.  20036
13      202-464-9910 ph.
        202-747-2947 fax.
14      athan@tsimpedeslaw.com

15

16  Dated:  January 23, 2014            Washington, DC

17

18

19

20

21

22

23

24

25

26

27

28

## <u>VERIFICATION</u>

By signing below, I swear under penalty of perjury that the foregoing statements

contained in this Complaint are true and correct based upon my personal knowledge.

Dated:  1/23/14

Bernard B. Kerik