Joe,

Keep in mind, I am now going through this as best as I can remember. I'm not sure these days, what I remember, what I've been told or what I've read.

If this differs any from reality it can't be much and the one thing I know without remembering anything is that Frank never asked me for anything other than the that letter that I mentioned earlier and I'm not sure if it was before or after I left government.

Let me know if you need anything else.

B


## COUNT II
## (Lack of Good Character)

31.    In the wake of the withdrawn nomination of Bernard Kerik (Kerik) as United States Secretary of Homeland Security in December 2004, the Division became aware of information indicating an extensive relationship among Interstate, the DiTommasos, Kerik and former Interstate employee Lawrence Ray (Ray).


32.    Kerik  was appointed by Mayor Rudolph Giuliani as Commissioner of the New York City Department of Corrections in 1998, and Police Commissioner in 2000.


33.    Ray had a long standing relationship with Kerik and served as best man at Kerik's wedding in November 1998.

I met Ray in 1994/1995 and he was best man in my wedding.

34.     Between 1998 and 2000, Ray gave Kerik thousands of dollars in gifts for Kerik's wedding expenses and Kerik's purchase of personal property and/or payment of debts.

35.     During 1998, Interstate was under active regulatory investigation by both the Division, in New Jersey, and the Trade Waste Commission (TWC), now known as the Business Integrity Commission, in New York City.

I was introduced to DiTommaso by Ray in late November/98 or December/98.

36.     Ray, who had a previous relationship with Frank DiTommaso, advised DiTommaso that Ray had a background in law enforcement and, therefore, could assist Interstate with its regulatory investigations.

Ray, to my knowledge had no prior law enforcement experience except for being a "cop buff". I don't know what he advised DiTommaso, nor has DiTommaso ever mentioned to me that Ray said " he could assist Interstate with its regulatory investigations.

37.    In 1998, Ray introduced Frank DiTommaso to Kerik, telling DiTommaso that "maybe he [Kerik] can help us."

I think Ray asked me what the process was but I don't remember the whole exact conversation. I don't remember if it was when they were in the office and  I don't remember DiTommaso personally asking me for anything when we met.

38.    Kerik recommended Ray for employment by Interstate, calling Ray a "top shelf guy" and telling DiTommaso "Larry 100 percent."

I never recommended Ray for any employment anywhere, with Interstate or otherwise. It is my understanding that this assertion came from a deposition statement by DiTommaso that was taken out of context and has since been corrected by DiTommaso on several occassions. I may have said something to the effect that Ray was a great guy, that I trusted him, that he was like a brother... but under no circumstance did it pertain to employment with Interstate, DiTommaso or anyone else. This is also something that would have seemed so strange to me that I would remember. Strange because I would never assume Ray would need or want a job based on who and what I believed he was, and had it come up, I'd be the first one to say that he didn't have the qualifications to help DiTommaso in any capacity to my knowledge.

39.    Frank DiTommaso described his meeting with Kerik as

follows:

> Mr. Ray walked into the office, unannounced, just walked right in, Mr. Kerik got up and came around the desk and give him a big hug and a kiss and they exchanged pleasantries, and introduced me and Mr. Kerik, Frank, I want to tell you -- he put his arm around Mr. Ray – I trust this guy more than my own brother.

==I don't recall if this happened or not, seems a little over the top, but could have... I just don't remember.==

40.     Subsequent to Kerik's recommendation, Frank DiTommaso hired Ray for Interstate.

==There absolutely was no recommendation for DiTommaso to hire Ray, nor did I know that Ray was subsequently employed by Interstate.==

41.     On November 18, 1998, a 46-page fax addressed to "Commissioner Kerik" from "Larry Ray/Frank DiTommaso" was sent to Kerik's office in New York; the fax contained an application for a permit transfer for FES Transfer & Recycling, Inc., a company in which Frank and Peter DiTommaso were each identified as 25% owners.

==I have no idea what this was, or what this was about. Ray on occasion would stop in the office if he had meetings in the City, or if we were going to lunch, he may have someone fax him something he needed. In looking at the date of the document, I don't think I had met DiTommaso by then.==

I only say that because if I had personally received that fax and later met DiTommaso, perhaps the name would have rung a bell. However, when we met, I don't remember discussing a document that was faxed to me with his name on it.

42.    Ray officially became employed by Interstate, at an annual salary of $100,000, in or about December 1998, and remained so employed until March 2000.

I have no idea when he was hired or how much he was making. I later heard from DiTommaso that he was on Interstate's payroll and he was fired subsequent to his indictment.

43.    A personal relationship also developed between Frank DiTommaso and Kerik.

True, limited but true.

44.    Frank DiTommaso was invited to Kerik's private Christmas party at the Department of Corrections in 1998.

I may have invited him or he may have come with Ray. We usually had in excess of 400 – 500 people at the annual Christmas party.

45.    Early in 1999, Kerik introduced Frank DiTommaso to Kerik's brother, Donald.

I don't recall exactly when, but I did introduce Don to DiTomasso. We had lunch somewhere near the Short Hills mall in New Jersey.

46.    Donald Kerik was thereafter hired by Interstate as yard manager of what had been the Metropolitan operation on Staten Island, at an annual salary of approximately $85,000.

There have been inferences made by the media that I got Don his job with Interstate and I had DiTommaso hire him. I know he was hired, I don't know what he made and don't know what his position was, and as far as I remember, DiTommaso and I never had any discussion about him hiring Don. I don't even recall it being a topic at our lunch. Whatever transpired between them, happened after that lunch… between them and I had nothing to do with it. Also, keep in mind that Don had I think about 10 years experience in the business before Interstate with various companies.

47.    On October 1, 1999, Frank DiTommaso sent a letter to the TWC which stated in part:

> The day–to-day operations of Interstate Materials
> Corp. have been taken over by Mr. Don Kerik.
> Don is a fine individual and will continue to
> provide your agency with full cooperation as we
> at Interstate Materials Corp. have always done.

I have no idea about this letter.

48.     During 1999, Bernard Kerik was living in an apartment located at 679 W. 239th Street, Bronx, New York.

Hala and I lived on the 7th floor in an apartment that I had rented from mid 1994.

49.     Bernard Kerik wanted to purchase a larger, double apartment in the same building, but was concerned about his ability to pay for the extensive repairs and renovations necessary to make the larger apartment habitable.

In mid 1998, Ray starting pushing me to look for a condo or co-op when Hala and I were talking about starting a family. Later in discussions with Nathan Berman who was involved in real estate development, he not only agreed but told me he would help me get the apartment. I think I went to the same real estate agent that rented me my apartment, who informed me that there was a larger apartment than what I had for sale in my building and I could probably get it for an inside price. This was not a double apartment as mentioned in this complaint or the press. At one time, more than twenty years earlier (according to the management company), it was two small apartments that were merged into one. The apartment had been vacant for more than a year (to my recollection) and would require renovations for us to move in.

50.     In a series of e-mails sent from Kerik to Ray between April and July 1999, Kerik: a) confirmed his close relationship with Ray and Frank DiTommaso; b) repeatedly solicited more money from Ray; c)

indicated his lack of sufficient  funds to both purchase and renovate his

new Bronx apartment; d) indicated that he would provide information  to

Frank DiTommaso regarding New York City contracts; e) provided advice

concerning Interstate's pending regulatory investigations;  f) requested

that Ray  intercede with Frank DiTommaso on behalf of Kerik's brother,

Donald; and g) facilitated a meeting between Ray and a former Director of

the Division, who had left his employment with the Division  in January

1999.

The e-mails that we were provided to us by the New York Daily News
contain statements that make no sense to me. In reviewing the above
mentioned assertions, they make no sense as well. d) with regard to
contracts… I've never spoken to DiTommaso about NYC contracts, nor
was I aware he was seeking any NYC contracts, but most importantly to
my knowledge and according to him, he has not acquired one NYC
contract since we met seven years ago. Lastly with regard to NYC
contracts, there is absolutely nothing I could have told DiTommaso
concerning a NYC contract that wasn't public knowledge, via DGS or one
of the NYC publications which I don't even know the names of. f) Have
Ray intercede on behalf of my brother… I have no idea what that's about,
more interesting, neither does my brother. I've asked him personally and
he did not recall anything like that. g) Facilitated a meeting with the
former Director of the Division… they have to mean Frank Catania from
New Jersey. First, Catania left office in late 98, or early 99. If he was the

former director when and if I introduced him to Ray, what does that mean. However, last year the press inquired about me going to lunch with Catania and Ray and they specified a restaurant in New Jersey where we were supposed to have gone. I told them I had not gone there with Catania and Ray... I just don't remember that. Catania has since told me that we never went to that restaurant together.

51.    Kerik signed a contract to purchase the new Bronx apartment in June 1999, and closed on the purchase in September 1999.

I believe this is true.

52.    According to documents and testimony obtained by the Division which provide sufficient indicia of reliability to form the basis for a finding under the Act, in or about September 1999, Woods Restoration Services (Woods Restoration), through Tim Woods (Woods), a principal of Woods Restoration, was brought into the Kerik project by Peter DiTommaso.

First, I don't know Peter DiTommaso. I met him once in passing in my town when he approached me and introduced himself in the summer of 2004 and he said then, that he had met me once before that. I did not and do not remember. When I was in the process of purchasing the apartment, Ray and DiTommaso came to the apartment (together, I think) at which time DiTommaso indicated that he knew someone that

could help me with the renovations. I remember when he talked about the contractor, he said he had worked with him in the past, he was from NJ, he had a small operation and it wouldn't cost a fortune. He recommended Tim Woods.

53.    Woods was personally acquainted with both Peter and Frank DiTommaso, and had at one time been employed by Interstate. I do remember DiTommaso saying that time had worked with him in the past but I don't know anything other than that.


54.    Based on  interactions with  Peter DiTommaso as well a prior history of  similar arrangements between Interstate and Woods Restoration, Woods' understanding was that any costs incurred by Woods Restoration on the project which were not paid for by Kerik would be reimbursed by Interstate. I don't know anything about their prior agreements, I don't anything about an arrangement between them over my apartment. I only remember seeing Woods in the building perhaps two or three times during the renovation. I'm not sure if DiTommaso ever came back after he recommended Woods, or if him and Woods were ever met at the apartment.


55.    Between 1999 and 2000, Woods Restoration engaged and paid subcontractors on the project and performed some of the renovation

work itself.

I believe the renovation began sometime in October and we moved in on February 1, 2000. I do not know who worked for Woods, or any of the sub-contractors. I don't know how much of the work was done by Woods if any at all.

56.     In total, the repairs and renovation of Kerik's new Bronx apartment had a true cost in excess of $200,000.

Not believable.

57.     Kerik paid Woods Restoration only $17,800 toward the true cost of said repairs and renovation.

Hala and I both believe it was around $30,000. In fact, on the day I called Tim Woods from Joe Tacopina's office, he agreed that it was around $30,000.

58.     The remainder of the true cost of said repairs and renovation was paid to Woods Restoration by Interstate.

I don't know this to be true and according to DiTommaso, it didn't happen.

59.     The payments by Interstate to Woods Restoration for the Kerik apartment were not reflected in any Interstate files or other documents indicating that Interstate had any involvement in the Kerik apartment project.

DiTommaso was very clear that he was not and did not have any involvement in anything to do with the renovation of the apartment.

60.     Instead, Peter DiTommaso directed that  costs of the Kerik apartment project be allocated and billed by Woods Restoration to other projects specified by Peter DiTommaso.

Unknown to me.

61.     Of the projects specified by Peter DiTommaso, Woods Restoration had worked on some for Interstate, but had no involvement with others.

I have no idea what this means.

62.     In or about July 1999, Kerik had a meeting with Raymond Casey, then a high-ranking official at the TWC, which was investigating Interstate.

On the evening John F. Kennedy Jr. was killed, Casey, myself and Mike Caruso (the DOC Inspector General) had dinner together in the pub on the corner by Kennedy's apartment. It wasn't a meeting... it was dinner. I had known Casey since 1992 when I met him on Giuliani's campaign trail. He was also a good friend of Caruso's.

Although I don't remember word for word, but sometime during dinner Casey asked me how long my brother had been working for Interstate. I remember initially feeling a little uncomfortable, like he had some sort of an issue with my brother. Then at some point I believe he may have asked me about Larry Ray. I don't remember if it had anything to do with Interstate, nor do I really remember what I said specifically, but it

wouldn't have been anything bad. Ray at that time was a friend, I trusted him and I don't think I would have said otherwise.

Although I don't remember much about our conversation being it was seven years ago, the one thing I am positive of, I never asked Casey for anything of behalf of Interstate or Frank DiTommaso at that dinner or anywhere else. I wouldn't have done that first and foremost, but if I did, there is no doubt in my mind, Casey would have made an issue out of it with the Mayor and with DOI, not to mention he would have been mandated to do so by virtue of his position.

63.    At said meeting, Kerik in substance vouched for the integrity of Ray, who was then an employee of Interstate, and further indicated that Ray could be helpful to the TWC in alleviating its concerns about Interstate.

I would not have had anything negative to say about Ray at the time and don't remember getting into "Ray being helpful to the TWC". For one thing, I did not know Ray was on the payroll and working for Interstate at the time, because I do remember being surprised later when I learned of it, after Ray was indicted. Until that, I was just under the impression he was a friend of DiTommaso's. Just a note: After Ray's indictment, I asked my brother about Ray's involvement in that business, and Ray being employed by Interstate. Don said he (Ray) would bounce in and out of the yard, ask some questions and leave. Don said Ray was hardly ever

there. He also said he himself never thought Ray was employed by Interstate.

64.     In or about September 1999, Kerik made his New York office available for a meeting between Ray and detectives assigned to the TWC who were then investigating Interstate.

I remember the meeting... I remember Ray saying he had OC information to report to the TWC and that's about it. I do not remember setting up the meeting but I had to because it happened in my conference room. I'm not sure if I called Casey or someone else to put the meeting together. I remember walking into the conference room with Ray and meeting I think two people. I could not tell you today who they were, what color they were, but I'm sure I didn't know them, or that I would remember. I didn't stay in the meeting, don't know what happened and never spoke to anyone about the meeting again to anyone that I can remember. As for the meeting being held in my office, I don't remember why. For some reason (I don't know if I heard this or remember it) Ray did not want to be seen at TWC. I believe this may be the reason.

65.     Prior to said meeting, Kerik welcomed and greeted Ray in the presence of the TWC detectives; Kerik then left the office and returned at the conclusion of the meeting.

For some reason, I remember walking into the conference room with Ray, not being in there and then greeting Ray. I believe they were already in the room. I do not remember returning at the end of the meeting. I may

have to say goodbye... I just personally don't remember. Note: Somewhere I read that these Detectives were interviewed and were on the record saying I had nothing to do with the meeting and never tried to influence them.

66.     During the course of its investigation, the Division obtained and served subpoenas for documents and testimony upon Kerik.

67.     Citing ongoing investigations by New York authorities involving similar matters, and on the advice of counsel, Kerik invoked the Fifth Amendment in response to Division requests for documents and testimony concerning the following: (1) Whether Frank DiTommaso ever directly or indirectly gave Kerik any money or other thing of value on behalf of Interstate; (2) Whether Frank DiTommaso ever asked Kerik to take any action on behalf of Interstate; (3) Whether Frank DiTommaso or Interstate paid Woods Restoration for any part of the cost or value of the renovation work on Kerik's Bronx apartment; (4) Whether, if any such payment was made, it was done pursuant to any understanding that Kerik would take any action that would benefit Frank DiTommaso or Interstate; (5) Whether Ray ever directly or indirectly gave Kerik any money or other thing of value on behalf of Interstate or Frank DiTommaso; (6) Whether Ray ever asked Kerik to take any action on behalf of Interstate; (7) The authenticity and contents of the e-mails from

Kerik to Ray referred to in Paragraph 50 of this Complaint; (8) Whether
in approximately July 1999, Kerik had a meeting with Ray Casey of the
TWC during which Kerik vouched for the integrity of Ray; and (8)
Whether Ray, Frank DiTommaso or any other individual acting on behalf
of Interstate requested that Kerik meet with Casey or otherwise take any
action in connection with Interstate's  investigation by the TWC.

They have written paragraph 67 in a manner that leads one to believe
that I only refused to answer certain questions when in fact, I did not
answer any question that was ask of me, except for the first, for which I
invoked the 5th.

68.     By directly and indirectly conferring money or other things of
value on Kerik during a period in which Kerik was a high-ranking public
official of New York City and was in a position to - and did - provide
assistance to Interstate, the DiTommasos and Interstate attempted to
influence Kerik in the performance or violation of his official duties.

To my knowledge, I never received any money or other things of value
while I was in government or otherwise. As for "being in a position to –
and did – provide assistance to Interstate".... I would strongly disagree
that I was in a position to assist Interstate with anything, and more so,
disagreeing in the strongest of terms, did not provide Interstate with any
assistance "in the performance or violation of" my official duties.

69.   *N.J.S.A.* 5:12-92c provides that all non-gaming casino service industries "shall be licensed in accordance with rules of the Commission."

70.   *N.J.A.C.* 19:51-1.3(c) provides that

> [e]ach applicant required to be licensed as a casino service industry in accordance with subsection 92c ... of the Act ... shall, prior to the issuance of any casino service industry ... license, produce such information, documentation, including, without limitation as the generality of the foregoing, its financial books and records, and assurances to establish by clear and convincing evidence its good character, honesty and integrity.

71.   *N.J.A.C.* 19:51-1.3(c)1 provides that

> [e]ach applicant for a casino service industry license issued pursuant to subsection 92c ... of the Act shall also be required to establish the good character, honesty and integrity of each of the persons required to be qualified pursuant to the provisions of N.J.A.C. 19:51-1.14.

72.   *N.J.S.A.* 5:12-86a  establishes as a mandatory disqualification criterion the "[f]ailure of the applicant to prove by clear and convincing evidence that the applicant is qualified in accordance with the provisions of this Act."

73.     Based on the information contained in Paragraphs 31 through 68 of this Complaint, Interstate and the DiTommasos lack, and have failed to prove by clear and convincing evidence that they continue to possess, good character, honesty and integrity, as required by *N.J.S.A.* 5:12-86a and *N.J.A.C.* 19:51-1.3(c).

**WHEREFORE**, the Division demands the following relief against Interstate  and the DiTommasos:

A.     Judgment that Interstate and the DiTommasos lack, and have failed to prove by clear and convincing evidence that they continue to possess, good character, honesty and integrity, as required by *N.J.S.A.* 5:12-86a and *N.J.A.C.* 19:51-1.3(c);

B.     Judgment that, as a result, Interstate and the DiTommasos are unqualified for, and disqualified from, continued non-gaming casino service industry licensure and qualification, pursuant to *N.J.S.A.* 5:12-92c and d and *N.J.A.C.* 19:51-1.3(c), 1.5 and 1.14(a)2;

C.     Judgment revoking the non-gaming casino service industry licenses held by Interstate and the qualifications held by the DiTommasos, pursuant to *N.J.S.A.* 5:12-129(1); and

D.     Judgment for such other and further relief as the Commission may deem just and appropriate under the circumstances.

## COUNT III
## (Supplying False Information)

74.     Paragraphs 31 through 68 of this Complaint are incorporated as if fully set forth herein.

75.     During the course of its investigation, the Division conducted sworn interviews of the DiTommasos.

76.     During said interviews, the DiTommasos were asked questions concerning Interstate's payment to Woods Restoration of any portion of the true cost of the repairs and renovation of Kerik's Bronx apartment, and either denied such payment or disclaimed any knowledge that any payments made to Woods Restoration were related to the Kerik project.

77.     In light of the documents and testimony obtained by the Division during the course of its investigation, the DiTommasos' denials or disclaimers are not credible and represent a wilful attempt to mislead the Division regarding an issue which threatens the licensure of Interstate and the qualification of the DiTommasos, as set forth in Count

II of this Complaint.

78.    *N.J.S.A.* 5:12-86b establishes as a mandatory disqualification criterion "the supplying of information which is untrue or misleading as to a material fact pertaining to the qualification criteria."

79.    Based on the information contained in Paragraphs 74 through 77 of this Complaint, Interstate and the DiTommasos have supplied information to the Division which is untrue or misleading as to a material fact pertaining to the qualification criteria, within the meaning of *N.J.S.A.*  5:12-86b.

**WHEREFORE**, the Division demands the following relief against Interstate and the DiTommasos:

A.    Judgment that Interstate and the DiTommasos have supplied information which is untrue or misleading as to a material fact pertaining to the qualification criteria, within the meaning of *N.J.S.A.* 5:12-86b;

B.    Judgment that Interstate and the DiTommasos are disqualified from continued non-gaming casino service industry licensure and qualification pursuant to *N.J.S.A.* 5:12-92d and *N.J.A.C.* 19:51-1.5

and 1.14(a)2;

C.     Judgment revoking the non-gaming casino service industry

licenses held by Interstate and the qualifications held by the

DiTommasos, pursuant to *N.J.S.A.* 5:12-129(1); and

D.     Judgment for such other and further relief as the

Commission may deem just and appropriate under the circumstances.

Respectfully submitted,

**PETER C. HARVEY**
**Attorney General of New**
**Jersey**

_____

By:

**Mitchell A. Schwefel**
**Assistant Attorney**
**General**

_____

**Gary A. Ehrlich**
**Assistant Attorney**
**General**

_____

**R. Lane Stebbins**
**Deputy Attorney**
**General**