UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
BERNARD B. KERIK
                Plaintiff,                    **Docket No.: 14-cv-02374-JGK**

    -against-                         **AMENDED VERIFIED COMPLAINT**

JOSEPH TACOPINA
                Defendant.
--------------------------------------------------------X

COMES NOW Plaintiff, Bernard B. Kerik, by and through counsel, Timothy C. Parlatore, Esq. and Complains of the Defendant, Joseph Tacopina Esq. as follows:

## INTRODUCTION

1.      This is an action against Joseph Tacopina Esq., ("Tacopina"), the founding attorney of Joseph Tacopina, P.C., and its successor in interest, Tacopina, Seigel & Turano, P.C.

2.      Defendant Tacopina, through his law practice has engaged in a long term pattern of flagrantly violating his ethical responsibilities, his fiduciary duties to his clients, as well as various state and federal statutes, in an effort to place his own interests above those of his clients.

3.      Plaintiff Bernard B. Kerik ("Kerik") is one of Defendant Tacopina's many former clients and victims, who has suffered immense damages by Defendant Tacopina's pattern of illegal and unethical actions against him from in and around 2006 to the present.

4.      In Mr. Kerik's case, Defendant Tacopina fraudulently misled Plaintiff to accept a plea agreement in a Bronx County state prosecution based on Tacopina's deliberate misrepresentations of the collateral consequences of that plea. Tacopina wanted to settle Mr. Kerik's matter for the purpose of creating positive press coverage for himself, at the expense of his client's best interests. Soon thereafter, federal prosecutors commenced in the investigation and prosecution of Mr. Kerik. Defendant Tacopina then became the subject or target of a

criminal/financial investigation by the same prosecutors investigating Mr. Kerik, and agreed to become a prosecution witness against Mr. Kerik in exchange for immunity in his own case.  He engaged in multiple proffer sessions and gave prosecutors information on his former client, to his former client's detriment, solely in order to avoid prosecution for his own misconduct.

5.      In the ensuing years, Defendant Tacopina has repeatedly and consistently lied to cover up his own wrongdoing in betraying his former client, as well as his oath as an attorney.  He has even gone so far as attempting to have Mr. Kerik arrested on false charges in an effort to silence him.

## JURISDICTION AND VENUE

6.      Pursuant to the original Verified Complaint, this Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. §1332.  The Defendant is a citizen of a state different than that of the Plaintiff and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff also invokes the supplemental jurisdiction of this Court with respect to claims based upon the laws of the State of New York, pursuant to 28 U.S.C. § 1367.

7.      Due to the additional claims raised in this Amended Verified Complaint, this Court also has subject matter jurisdiction pursuant to 18 U.S.C. §1964.

8.      Venue in this judicial district is designated by Court Order transferring this case from the District of New Jersey to the Southern District of New York.

## THE PARTIES

9.      Plaintiff Bernard B. Kerik, is an adult male, married with children, residing at 905 Old Mill Road Franklin Lakes, New Jersey 07417.  Mr. Kerik is the former New York City Police Commissioner.

10.     Joseph Tacopina, Esq., an attorney at law of the State of New York, was the founding attorney of the Joseph Tacopina P.C., and its successor in interest, Tacopina Seigel & Turano, P.C with his office located at 275 Madison Avenue, New York, New York 10016.

## FACTUAL BACKGROUND

At all times relevant to this Verified Amended Complaint, unless otherwise indicated:

### The Enterprise

11.     At all times relevant to this Complaint, Defendant Tacopina, and others known and unknown, were members, partners, and associates[1] of the law firm of Joseph Tacopina PC, and its successor in interest, Tacopina Seigel & Turano, P.C (hereinafter the "Tacopina Firm").

12.     The Tacopina Firm, including its leadership, employees, and associated entities and individuals, constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, which engaged in, and the activities of which affected, interstate and foreign commerce. The Tacopina Firm is an organized group based in New York City that operated in the Southern District of New York and elsewhere and constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

13.     The Tacopina firm was founded in or before 1997, while Tacopina was still a partner in another firm.

### Methods and Means of the Enterprise

14.     The principle purpose of the Tacopina Firm was to generate money for its members, partners and associates.  This purpose was implemented by members, partners, and

---

[1] For the purpose of this complaint, "associates" refers to all individuals associated with the firm, officially or unofficially, and is not limited to junior attorneys employed in the position of associate.  This includes, but is not limited to, office managers and staff, investigators, interns, of-counsel attorneys, and other attorneys and individuals who have been hired or affiliated to assist the Tacopina Firm in any capacity.

associates of the Tacopina Firm through various criminal activities, including extortion, wire fraud, and obstruction of justice.  The members, partners, and associates also furthered the enterprise's activities by threatening economic and reputational injury to anyone who stood in their way.  They also rewarded those members of the press who wrote positive articles about Tacopina and the Tacopina Firm by giving them secret information about their clients, without authorization, and to their client's detriment.

15.     Although the primary purpose of the Tacopina Firm was to generate money for its members, partners, and associates, the members, partners, and associates at times used the resources of the firm as a vehicle to settle personal grievances, manipulate the media, and present a false public image to protect the reputation of the enterprise, as well as its members, partners, and associates, and others.

**Inappropriate Manipulation of the Media to Falsely Inflate Tacopina's Public Image**

16.     In order to advance the money making goals of the enterprise, Defendant Tacopina made significant efforts to create a grossly exaggerated public image of his skill as an attorney.

17.     In November 2005, the Tacopina Firm was retained to represent Melanie McGuire in the New Jersey criminal case known as the "Suitcase Murder."  The case received significant media attention and Defendant Tacopina used the case as an opportunity to boost his legal career. During the 1 ½ year litigation Tacopina began to engage in an extra-marital affair with Individual A[2], a producer from a major national television network.  At the time, Individual A was married to a man who was an acquaintance of Tacopina's.  The two began their illicit liaisons at the Heldrich Hotel in New Brunswick, New Jersey.

---

[2] All identifying information about this individual, and others, who have been victims, or pawns in Defendant Tacopina's activities have been withheld from public filings to protect the individual's reputations.

18.     On information and belief, Defendant Tacopina attempted to take advantage of his illicit relationship with Individual A, as well as her high ranking position within the news organization to orchestrate a public relations campaign that falsely inflated his own accomplishments and skills in order to further the business of the Tacopina Firm.  Tacopina's target objective was to try to cause Individual A to compromise her journalistic integrity in an attempt to insulate Tacopina from derogatory coverage of his poor performance in the failed defense of Melanie McGuire, and the large scale dissemination of deceptively positive press coverage.  Tacopina also attempted to leverage his relationship with Individual A to gain employment with the network as an "independent" legal analyst.

19.     Defendant Tacopina also carried on a long term affair with Individual B, a cable news television personality.  Defendant Tacopina used his relationship with Individual B to get himself repeated appearances on Individual B's show and others, as well as to ensure that he received excessively positive treatment in the network's coverage.

20.     Tacopina also took advantage of a long term friendship with Individual C, a journalist who was also covering the "suitcase murder" to orchestrate the publication of a semi-fictional "puff-piece," which was published in the March 2007 issue of GQ Magazine, entitled "1-800-SAVE-MY-ASS."  This article, although fact checked by the journalist and her editors, was hopelessly infected by the numerous false representations by Tacopina, in an effort to deceptively paint himself in the most positive light possible.

21.     Additionally, on information and belief, Defendant Tacopina has made a practice of leaking information detrimental to his client's interests, and without the client's authorization, as a reward to reporters who agree to publish positive stories about Tacopina and the Tacopina Firm.  This practice led to Tacopina being terminated on at least one high-profile celebrity case.

22.     On information and belief, one method that Tacopina often employs is to leak a case to the media after he is retained by a high profile client who would prefer that the case be kept quiet.  He then explains to the client that the media somehow figured the case out and called him, but that he can spin the story in their favor. He never reveals to the client that he is, in fact, the source of the leak.

<strong>Threats and Intimidation to Prevent Bad Publicity</strong>

23.     Along with Tacopina's manipulation of Individual A to create misleading and deceptive positive press to further the enterprise, Defendant Tacopina has an even longer history of threatening and intimidating any reporter he believes may publish facts about him, which could be construed as unflattering.

24.     In June, 2008, when Defendant Tacopina received a question from Individual D a journalist from an online publication, Tacopina responded by hiring an attorney to threaten and intimidate Individual B into silence by sending him a letter threatening to file a completely frivolous defamation lawsuit.   Unintimidated, Individual B published the content of this threatening letter in his online column.

25.     In June, 2010, it was reported that Individual E, a reporter from an online and print publication was working on an unfavorable profile of Defendant Tacopina.  On information and belief, Tacopina engaged in similar threats and intimidation, which resulted in the profile not being published.

26.     In the most extreme example of Tacopina's intimidation tactics, on February 5, 2014, Defendant Tacopina filed a lawsuit in the Southern District of New York against Individual F and Individual G, reporters for an online and print newspaper, for publishing an article detailing the facts and circumstances surrounding this case.  In the complaint, Tacopina himself, through

attorney Judd Burstein ("Burstein"), describes his attempts, with others, to threaten and intimidate the reporters into silence.  When the reporters refused to heed Tacopina's threats, he filed a completely frivolous lawsuit against them.

27.     However, on April 13, 2014, before the defendants had the opportunity to answer the complaint, Defendant Tacopina filed a Notice of Voluntary Dismissal, dismissing the complaint with prejudice.

## FIRST COUNT
### (Racketeering)

28.     Paragraphs 1 through 27 of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

29.     From at least in or about 2006 up through and including the present, in the Southern District of New York and elsewhere, Defendant Tacopina, and others known and unknown, being persons employed by and associated with the racketeering enterprise described in paragraphs 11 through 27 above, namely, the Tacopina Firm, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully intentionally, and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), that is, through the commission of the following racketeering acts:

**The Pattern of Racketeering**

30.     While the pattern of racketeering acts pleaded here is confined to the actions taken by Tacopina which directly targeted Plaintiff, Mr. Kerik, and which were the proximate causes of his injuries, there are numerous more racketeering acts which could have been added, were this brought as a multi-plaintiff, class action, or criminal RICO case.

31.     The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

**Racketeering Act One – Wire Fraud Relating to the Bronx Case**

32.     The story of this case begins with Defendant Tacopina's representation of Mr. Kerik in Bronx County Supreme Court, where Defendant Tacopina made false and misleading representations regarding a plea agreement – specifically regarding the collateral consequences of that plea, which resulted in substantial and/or irreparable harm to Plaintiff.[3]  Defendant Tacopina represented that no harm would result, in order to lure Mr. Kerik into accepting a plea of guilty to what Defendant Tacopina described as "a violation, no different than pissing on the sidewalk," with no repercussions. However, it was in fact the catalyst to federal criminal charges, including tax charges, which Tacopina had specifically advised would not arise from taking the plea in the Bronx case.  Defendant Tacopina even responded to reporters who asked about taxes, "That's all been taken care of."

33.     Mr. Kerik the former New York City Police Commissioner, met Joseph Tacopina in 2002, and maintained a close personal relationship with him for several years.

---

[3] Nothing in this complaint should be misconstrued as a recantation of this or any other plea allocution entered.  This is not a collateral attack on the convictions and Mr. Kerik respects the judgments which have been entered against him.  However, this does not absolve Defendant Tacopina of his ethical duties to provide competent, honest, and conflict-free representation, or his breach of those duties in his cooperation with Federal prosecutors against his client's interests.

34.     On December 3, 2004, President George W. Bush nominated Bernard B. Kerik as Secretary of the U.S. Department of Homeland Security.

35.     On December 10, 2004, Mr. Kerik withdrew his name from consideration for Secretary of the U.S. Department of Homeland Security, which ignited media inquiries.

36.     Starting in December 2004, Mr. Tacopina began representing Mr. Kerik by responding to questions from the media soon after Mr. Kerik declined the nomination for the Secretary of the U.S. Department of Homeland Security.

37.     Upon information and belief, from 2005 through 2006, the Bronx County District Attorney's Office ("BCDAO") and the New York City Department of Investigation ("DOI") were jointly investigating Kerik's activities while he was Commissioner of the New York City Department of Corrections ("DOC") between January 1998 and August 2001 (hereinafter referred to as the "Bronx case").  The Bronx case investigation centered around renovations and payment for renovations to the Kerik's apartment located in the Bronx, NY.

38.     Soon after declining the nomination for the Secretary of the U.S. Department of Homeland Security, Defendant Tacopina informed Mr. Kerik that he was contacted by Walter Arsenault, the First Deputy Commissioner of the DOI about the investigation.

39.     Upon information and belief, Defendant Tacopina, then Mr. Kerik's attorney, met with representatives of the DOI, and the BCDAO to discuss some of the allegations they were investigating, relating to apartment renovations paid for by Mr. Kerik for an apartment in the Bronx, owned by Plaintiff and his wife, Hala.

40.     At some point during the case, Defendant Tacopina on his own initiative recruited Kenneth Breen, Esq, and requested that Mr. Kerik hire Mr. Breen to assist Tacopina in defending Mr. Kerik during the grand jury phase of the investigation in the Bronx case.

41.     On June 20, 2006, Mr. Tacopina ecstatically sent Mr. Kerik an email that read:

> "we got everything we wanted...the 2 unclassifed...the no evid of agreement language...the "believing interstate was clean" ...i got them to agree to u got some renovations paid for by interstate or ITS SUBSIDIERIES!!...(which could mean woods just never billed u!!)...NO GRAND JURY REPORT & NO DOI REPORT...ALL INVEST. By DOI closed!! ( asrsenault will have to get a life)....on friday june 30!!"

42.     After some discussion, during which Mr. Kerik felt that Defendant Tacopina wanted him to allocute in a manner that Mr. Kerik believed to be dishonest and perjurious, Tacopina convinced Mr. Kerik to accept the language for the allocution that would both satisfy the terms of the plea agreement, while allowing Mr. Kerik to maintain his integrity in allocuting honestly.

43.     Prior to and after accepting the terms of the plea agreement, Mr. Tacopina made telephone calls and went to Mr. Kerik's home in New Jersey, and represented to Mr. Kerik and his wife, that Mr. Kerik's pleading guilty to the charges as drafted and negotiated by Defendant Tacopina would end any and all investigations against him, and that there would be no tax liabilities as a result of his plea (falsely holding himself out to be a tax law expert by explaining and representing that the law provides that "a gift giver is responsible for any gift tax), and that Mr. Kerik and his family could move on with their lives. In reliance upon the representations by Defendant Tacopina who Mr. Kerik trusted, Mr. Kerik accepted the plea agreement.

44.     On June 30, 2006, on the persistent advice and knowingly false representations of Mr. Tacopina regarding the potential collateral consequences of the negotiated plea agreement with the Bronx District Attorney's Office, Mr. Kerik pled guilty to two ethics violations.

45.     Tacopina's numerous false statements to Mr. Kerik was part of a scheme or artifice to defraud, based on representations, or promises, in which Defendant transmitted, or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign

commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, in violation of Title 18, United States Code, Section 1343.

46.     Plaintiff was the target of this fraud and that Tacopina's actions were the proximate cause of the injuries he sustained, in an amount to be determined at trial.

### Racketeering Act Two – Obstruction Of Justice Related to Tacopina's Cooperation Against Kerik

47.     Defendant Tacopina compounded his harm towards Plaintiff, when he engaged in at least five separate secret meetings with federal prosecutors, beginning on June 11, 2007, where he provided information that was against the interest of his client, Mr. Kerik, while simultaneously concealing the fact that Defendant Tacopina himself was a subject or target of an ongoing federal criminal investigation.

48.     During Defendant Tacopina's multiple proffer sessions with federal prosecutors, at which he was represented by counsel, he signed proffer agreements (a.k.a. Queen-for-a-day agreements), which provided him limited use immunity for any statements that he made during the proffer sessions.  On information and belief, he was also warned that any false statements made would be a felony, for which he would be prosecuted.

49.     At those proffer sessions, in an effort to falsely paint the plea negotiations in the Bronx Case as being an act of obstruction of justice in furtherance of Kerik's alleged crimes, Defendant Tacopina gave information about communications that he had with his client, Kerik, as well as confirming a highly questionable statement by DOI First Deputy Commissioner Walter

Arsenault ("Arsenault") regarding meetings between Tacopina and members of the Bronx District Attorney's Office.[4]  On information and belief, these statements made by Tacopina were false.

50.     Defendant Tacopina made these statements to federal prosecutors voluntarily, against the best interests of his client, without making any attempt to first seek judicial intervention authorizing him to make such disclosures.[5]

51.     That Defendant Tacopina's untruthful responses were designed to corruptly influence, obstruct, or impede or endeavor to influence, obstruct or impede the due administration of justice in violation of Title 18, United States Code, Section 1503.

52.     On information and belief, as a result of Defendant Tacopina's illegal actions, he provided great assistance to federal prosecutors in pursuing criminal charges against Bernard Kerik.  These actions were taken to specifically target Plaintiff and they directly caused Plaintiff significant damage, in an amount to be determined at trial.

**Racketeering Act Three – Obstruction of Justice Related to Tacopina's Deprivation of Mr. Kerik's Counsel of Choice**

53.     After Tacopina's recusal from the case due to his cooperation with the Government, Mr. Kerik was represented by Kenneth Breen ("Breen"), who had also represented him in the Bronx Case.

---

[4] Arsenault is currently a defendant in a separate case, *Caruso v. The City of New York, et. al.,* 06-cv-5997-RA, where the Plaintiff, Michael Caruso is alleging that he was wrongfully terminated from his position as a DOI investigator because he refused Arsenault's direction to perjure himself to assist Arsenault in prosecuting Mr. Kerik.

[5] Although Judge Robinson ruled, after the fact, that Tacopina's statements were not privileged on January 3, 2008, this decision was made without allowing Mr. Kerik any discovery, or an evidentiary hearing, and was based on the double-hearsay statements of AUSA Elliot Jacobson, who claimed that Tacopina stated that Mr. Kerik had stated that Tacopina was authorized to disclose the information.  Judge Robinson went on to contradict himself by correctly stating "it is likely that the Defendant will disagree with and heavily cross-examine Mr. Tacopina regarding the alleged authorization by the Defendant as well as the substance any discussions. The Defendant may also choose to attack Mr. Tacopina's credibility."

54.     On March 30, 2007, federal prosecutors sent a letter to Breen, advising him to recuse himself from representing Mr. Kerik.  Breen declined to do so.

55.     After the AUSA presented Mr. Breen with the witness list with Tacopina on it, on November 15, federal prosecutors called Breen on the phone to reiterate their desire for him to recuse himself from representing Mr. Kerik.  Breen again declined to withdraw from the case.

56.     Immediately thereafter, on November 19, 2007, Defendant Tacopina secretly met with federal prosecutors to provide them with information about Mr. Breen's Bronx representation and to improperly discuss internal legal strategies, discussions, and relationships.

57.     On November 29, 2007, based on the information provided by Tacopina, federal prosecutors filed a motion to disqualify Breen.  That motion was granted, over defendant's objections on January 23, 2008

58.     That Defendant Tacopina's improper disclosures were designed to corruptly influence, obstruct, or impede or endeavor to influence, obstruct or impede the due administration of justice in violation of Title 18, United States Code, Section 1503.

59.     On information and belief, as a result of Defendant Tacopina's illegal actions, federal prosecutors were able to deprive Plaintiff of the counsel of his choice.  These actions were taken to specifically target Plaintiff and they directly caused Plaintiff significant damage, in an amount to be determined at trial.

**Racketeering Act Four – Obstruction of Justice Related to Tacopina's lies to Federal Prosecutors**

60.     During Defendant Tacopina's multiple proffer sessions with federal prosecutors, at which he was represented by counsel, he signed proffer agreements (a.k.a. Queen-for-a-day agreements), which provided him limited use immunity for any statements that he made during

the proffer sessions.  On information and belief, he was also warned that any false statements made would be a felony, for which he would be prosecuted.

61.     On information and belief, during these proffer sessions, Defendant Tacopina was asked to provide full and truthful information about his own prior bad acts.  The purpose of these questions was to assist prosecutors in making a determination as to Defendant Tacopina's viability as a witness at trial against Kerik and any other individual who may be prosecuted based on Tacopina's information.  Additionally, this information was necessary in order for prosecutors to fulfill their *Brady* and *Giglio* obligations.

62.     On information and belief, Defendant Tacopina lied to federal prosecutors regarding his own history of misconduct.

63.     First, Defendant Tacopina lied regarding his numerous extra-marital affairs.[6] While he admitted to several (including Individual A), he omitted countless others.  This includes, but is not limited to other television personalities, and at least one former client.

64.     More seriously, on information and belief, Defendant Tacopina lied when directly confronted about having an affair with the wife of a client.

65.     On information and belief, in March, 2002, Defendant Tacopina was hired to represent an individual, Joseph (last name withheld), as a witness before a Grand Jury proceeding. Soon thereafter, Joseph began to suspect his wife of having an affair.  He hired a private investigator, who discovered that Defendant Tacopina and Joseph's wife were, in fact, engaged

---

[6] While Tacopina's extra-marital affairs would normally be a private matter between him and his wife, they are relevant to this case for a few specific reasons.  First, Defendant Tacopina used several of his extra-marital affairs with members of the media to advance the reputation and public image of the enterprise.  Second, his dishonesty with prosecutors regarding his affairs was designed to falsely bolster his credibility and viability as a witness against Mr. Kerik, thereby increasing the chances that he would receive immunity for his own wrongdoing.

in an extra-marital affair and tracked them to a hotel in New York City on August 8, 2002.  Cell phone records and hotel records showed that this was an ongoing affair.[7]

66.     Almost immediately after discovery, Defendant Tacopina agreed to withdraw from the case and provide Joseph with a full refund in order to avoid any litigation or disciplinary complaints.

67.     Additionally, on information and belief, Defendant Tacopina failed to provide federal prosecutors with truthful information about his own fraudulent business records, much of which was structured in a manner that would allow him to engage in expensive trysts, while concealing the costs from his wife.

68.     That Defendant Tacopina's untruthful responses were designed to corruptly influence, obstruct, or impede or endeavor to influence, obstruct or impede the due administration of justice in violation of Title 18, United States Code, Section 1503.

69.     On information and belief, as a result of Defendant Tacopina's illegal actions, federal prosecutors accepted his credibility and viability as a witness against Plaintiff, Bernard Kerik, which targeted Plaintiff and directly caused Plaintiff significant damage, in an amount to be determined at trial.

**Racketeering Act Five – Obstruction of Justice by Subornation of Perjury**

70.     While cooperating with federal prosecutors, Defendant Tacopina required corroboration for several of his untruthful statements.  To assist in this endeavor, he enlisted the help of Individual H, his long term office manager.

---

[7] Annexed hereto at Exhibit "A" is a redacted copy of the divorce complaint, as well as a portion of an affidavit from Joseph regarding this affair.

71.     On information and belief, at Tacopina's direction, Individual H met with prosecutors and provided them with knowingly false information.  Moreover, Individual H repeated the same false information under oath to the grand jury.

72.     That after committing the above mentioned acts, Individual H was witnessed stating "He [Tacopina] owes me because I just lied for him."

73.     That Individual H's untruthful responses, on Tacopina's behalf were designed to corruptly influence, obstruct, or impede or endeavor to influence, obstruct or impede the due administration of justice in violation of Title 18, United States Code, Section 1503.

74.     On information and belief, as a result of Defendant Tacopina's illegal actions, federal prosecutors accepted his credibility and viability as a witness against Plaintiff, Bernard Kerik, which was targeted at Plaintiff and directly caused Plaintiff significant damage, in an amount to be determined at trial.

## Racketeering Act Six – Wire Fraud Related To the Follieri Deal

75.     In or around September 2007, Mr. Tacopina requested the help of Mr. Kerik regarding a substantial business transaction between Mr. Tacopina and his friend and client, Mr. Raffaello Follieri, an Italian businessman.

76.     Defendant Tacopina told Mr. Kerik that he was representing Mr. Follieri in a real estate venture that required $100 million in funding, and if Mr. Kerik could assist in obtaining the funding, it would result in a $1.5 million finder's fee, that Defendant Tacopina and Mr. Kerik would split (hereinafter referred to as the "Follieri deal").

77.     In reliance on Defendant Tacopina's representations, Mr. Kerik used his resources to find a suitable investor for the Follieri deal.

16

78.     On or about September 15, 2007, Mr. Kerik introduced Defendant Tacopina and Mr. Follieri to a representative of a Connecticut based hedge fund, Plainfield Assets, as a possible investor for the Follieri real estate deal.

79.     Between September 15, 2007 and mid-October 2007, Plainfield Assets agreed to fund the real estate project for Mr. Follieri.

80.     At the November 5, 2007 meeting where Defendant Tacopina informed Mr. Kerik of his troubles with the law (discussed more fully in paragraph 142 *infra*), Defendant Tacopina asked Mr. Kerik for his assistance again in obtaining funding for the acquisition of an Italian Soccer Team. During this conversation, Defendant Tacopina confirmed the finder's fee in the Follieri deal was $1.5 million, which the two of them would split.

81.     On or about November 30, 2007, Mr. Kerik learned from a representative of Plainfield Assets that the original finder's fee agreement in the Follieri deal was actually for $2.5 million and not $1.5 million as represented by Mr. Tacopina to him.

82.     Sometime later, Mr. Kerik discovered that the original agreement with Mr. Follieri and Defendant Tacopina regarding the finder's fee, was indeed $2.5 million, and was signed on October 5, 2007.

83.     That Tacopina's numerous false statements to Mr. Kerik in which he claimed that the finder's fee to be split was only $1.5 million rather than the actual $2.5 million figure was part of a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, in which Defendant transmitted, or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, in violation of Title 18, United States Code, Section 1343.

84.     Plaintiff was the target of this fraud and that Tacopina's actions were the proximate cause of the injuries he sustained, in an amount to be determined at trial.

**Concealment of the Scheme or Artifice to Defraud**

85.     That upon the discovery of his scheme or artifice to defraud, and as further evidence of that scheme or artifice, Defendant Tacopina has engaged in a pattern of dishonest behavior to conceal his wrongdoing, which continued from December 2, 2007 through May 27, 2014.

86.     On December 2, 2007, after Mr. Kerik expressed his concern to a mutual friend of Defendant Tacopina's misrepresentation about the $1 million discrepancy in the finder's fee, Mr. Tacopina sent Mr. Paul D'Emilia, an employee of Mr. Kerik, the following email:

>            Paul.....just so you know the increase I got from follieri from 1.5 mm to 2.5mm occurred after I was told I couldn't speak to BK right now!!.....otherwise of course I would have told him myself....and let bk know I am making follieri execute a personal guarantee.....and that I am splitting everything with him even addt'l $ I worked into the deal.

87.     On or about December 9, 2007, despite instructions to stay away from Mr. Kerik and with full knowledge that any contact could result in a revocation of Mr. Kerik's bail, Mr. Tacopina flagrantly disregarded Mr. Kerik's liberty interests, as well as his fiduciary duty to Mr. Kerik by calling Mr. Kerik at his home in New Jersey.

88.     During this telephone conversation with Mr. Kerik on December 9, 2007, which lasted approximately 10 minutes, Mr. Tacopina made several statements, including:

>            a.      He acknowledged that he was on the witness list and that he and Kerik shouldn't be talking – "Ken called and said you can't call me, because uh, you know, I'm on this fucking witness list."

>            b.      He knew Mr. Kerik was not getting a fee from Plainfield Assets – "I also told him you weren't getting any fee from uh…from Plainfield."

c.      That he told Mr. Follieri that half of the finder's fee was for Mr. Kerik – "he goes 'no, my agreement is with you, I don't owe him anything.' I go that, you're actually wrong, I go you knew he was in the picture and that's why you increased the fee and I got an email saying that.  Raffaello, so you can't, you can't take that tact. And I said, and I said, you know, honestly? I know Bernie for a long time, he is one of my closest friends, don't think for one second I'm not gonna go after that money to protect his fee, 'cause I brought him into the thing."

d.      That he told Mr. Kerik that Follieri cannot be trusted – "Because this guy is, you know, Bernie, he's everything that you know, we're not. He's a sneaky, you can't trust him as far as you can throw him sort of guy. And no question about that."

e.      That he told Mr. Kerik that he would employ all necessary methods, including the knowledge he had gained about Follieri's finances, to recover the fee – "I just want you to know that no matter what I'm gonna get this money, 'cause I know where his money is and I know what liens to put on things, and I'm gonna do that."

Evidently, Defendant Tacopina has no reservations about creating conflicts even between his clients, to avoid being caught in between the weight of his own misrepresentations.[8]

89.      To this day, Defendant Tacopina continues to deny and conceal his motives and representation of the Follieri deal and has done so publicly.

90.      Through his former attorney, Defendant Tacopina has denied ever contacting Mr. Kerik after the witness list was released.

91.      On December 28, 2013, in response to a New York Daily News article, Defendant Tacopina concealed his misrepresentations by denying on the record, that he had an understanding "either verbally or in writing, for Mr. Kerik to be part of any transaction, finder's fee or otherwise, with Follieri," and claimed that Kerik had a separate finder's fee deal with Plainfield.  These statements are belied by Defendant Tacopina's own words on the recording.

---

[8] A transcript of this entire conversation, which was consensually recorded by Mr. Kerik is annexed hereto at Exhibit "B."  A CD with the audio was submitted as an exhibit to the prior Amended Verified Complaint.

92.     On May 27, 2014, Mr. Kerik revealed the existence of the recording of his phone call from Tacopina, a recording which Tacopina did not know existed and therefore had felt comfortable in deceitfully denying that the conversation ever happened.  Since this revelation, Defendant Tacopina has remained silent.

### Racketeering Act Seven – Attempted Extortion of Individual D

93.     In June, 2008, Defendant Tacopina received a question from Individual D, a journalist from an online publication, regarding his relationship with Mr. Kerik.

94.     This online publication is a weekly column, published on an internet website and elsewhere.  It is a business operating in interstate commerce.

95.     Tacopina never responded to Individual D's question.  Instead, he had an attorney send a letter attempting to intimidate Individual D into silence by threatening to file a completely frivolous defamation lawsuit.  At no time was there anything in Individual D's communications that indicated that he had any intent to write anything untrue or defamatory.

96.     This letter threatened economic harm to Individual D unless he refrained from publishing an article that cast Tacopina in a negative light.

97.     Unintimidated by Defendant Tacopina's attempts, Individual D published the content of this threatening letter in his column in June 2008.

98.     By his actions, and those taken by others on his behalf, Defendant Tacopina attempted to obstruct, delay, or affect commerce by threats of economic harm, in violation of Title 18, United States Code, Section 1951

99.     That the object of such attempt was to protect the falsely inflated reputation of Defendant Tacopina and the Tacopina Firm, while preventing the truth from being disclosed about his pattern of activity which directly damaged Plaintiff, Mr. Kerik.

**Racketeering Act Eight – Extortion of Individual E**

100.    In June, 2010, it was reported that Individual E, a reporter for an online and print magazine, was working on an unfavorable profile of Defendant Tacopina.

101.    The magazine is a magazine of popular culture, fashion, and current affairs, which publishes editions in the United States and worldwide, both online and in print.  As such, it is a business operating in interstate and foreign commerce.

102.    On information and belief, Tacopina again enlisted the assistance of others to threaten and intimidate Individual E and the editors at the magazine with threats of frivolous defamation litigation and economic harm unless they refrained from publishing an article that cast Tacopina in a negative light.  At no time did Mr. Tacopina have any reason to believe that such article would contain any untrue statements.

103.    Defendant Tacopina was particularly fearful of this particular profile because, in addition to the revelations about his betrayal of his former client Mr. Kerik, Defendant Tacopina believed that Individual E intended to reveal Defendant Tacopina's drug abuse.

104.    On information and belief, Defendant Tacopina was abusing prescription pain medications, which he obtained from various physicians.

105.     On information and belief, as a result of Tacopina's threats of economic harm, the profile was never ultimately published.

106.    By his actions, and those taken by others on his behalf, Defendant Tacopina obstructed, delayed, or affected commerce or the movement of any article or commodity in commerce by threats of economic harm, in violation of Title 18, United States Code, Section 1951

107.    That the object of such attempt was to protect the falsely inflated reputation of Defendant Tacopina and the Tacopina Firm, while preventing the truth from being disclosed about his pattern of activity which directly damaged Plaintiff, Mr. Kerik.

### Racketeering Act Nine – Attempted Extortion of Individuals F and G

108.    In September or October 2013, Defendant Tacopina became aware that reporters from an online and print newspaper intended to publish a story about his shameful misrepresentation of Mr. Kerik and his cooperation with federal prosecutors.

109.    On information and belief, Defendant Tacopina immediately again engaged in his now well-practiced pattern of threatening and intimidating the reporters with frivolous defamation lawsuits and economic harm in an attempt to prevent the story from being published.

110.    These threats of a defamation lawsuit were completely frivolous as Defendant Tacopina had no reason to believe that the reporters would publish anything that was untrue. Defendant Tacopina knew better than anyone the extent of his cooperation with federal prosecutors.  If anything, Tacopina may have believed that the article would paint him in a more positive light than he deserved, as he believed the full truth about his cooperation against Kerik and others had been concealed.

111.    On December 28, 2013, the article was published both online and print versions. The article detailed Tacopina's history and cooperation with federal prosecutors against his former client, Mr. Kerik, as well as other misdeeds.[9]

112.    On February 5, 2014, Defendant Tacopina filed a frivolous and retaliatory lawsuit in the Southern District of New York against Plaintiff, the newspaper, and the reporters, Individual F and Individual G, as retaliation for publishing the negative, but factual article detailing the facts

---

[9] A copy of this article is annexed hereto at Exhibit "C."

and circumstances surrounding this case.  In the complaint, Tacopina himself, through attorney Judd Burstein ("Burstein"), describes his attempts to threaten and intimidate the reporters into silence.

113.    Additionally, by filing the false and frivolous lawsuit, Defendant Tacopina also sought to send a message to all other reporters that if they printed any negative material about Tacopina, or made any attempts to shed the light of truth on his falsely inflated reputation, that they would face similar economic harm.

114.    On April 13, 2014, Defendant Tacopina filed a Notice of Voluntary Dismissal, dismissing the complaint with prejudice.

115.    By his actions, and those taken by others on his behalf, Defendant Tacopina attempted to obstruct, delay, or affect commerce by threats of economic harm, in violation of Title 18, United States Code, Section 1951.

116.    That the object of such attempt was to protect the falsely inflated reputation of Defendant Tacopina and the Tacopina Firm, while preventing the truth from being disclosed about his pattern of activity which directly damaged Plaintiff, Mr. Kerik.

**Racketeering Act Ten – Wire Fraud**

117.    In addition to the above detailed pattern of activity designed to conceal his wrongful conduct related to his representation of Mr. Kerik, Defendant Tacopina has taken the betrayal and fraud another step further by falsely touting his representation and relationship with Mr. Kerik in an attempt to promote the Tacopina Firm – a pattern that continues to the present day.

118.     As discussed *infra*, a semi-fictional article was published in GQ Magazine profiling Defendant Tacopina.  This article was based primarily on lies and misrepresentations made by Defendant Tacopina in an effort to create a false image for himself.

119.     Additionally, this article includes a photograph of Defendant Tacopina with Mr. Kerik, along with several passages extolling the "successful" representation of Mr. Kerik by Tacopina:

> Joe was the guy who got Bernie a sweet deal when the shit hit the fan: Kerik faced up to sixty years in bribery charges, but ended up with two "unclassified misdemeanors" – a slap on the wrist.  Bernie loves Joe so much that he gave him his Medal of Valor from his years as Police Commissioner.

120.     Notwithstanding the fact that Defendant Tacopina knows this and other statements in the article to be false, he continues to display the article prominently on his website and actively promotes it, including a YouTube video, which was produced and published by the Tacopina firm on February 26, 2014 – one of many efforts to repair the public image of Defendant Tacopina and the Tacopina Firm in the wake of the revelations of this case.

121.     Additionally, there are no less than four additional misleading references to Tacopina's representation of Mr. Kerik on his website.[10]

122.     These actions constitute a scheme or artifice to defraud, of for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, which Defendant Tacopina transmitted, or caused to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice, in violation of Title 18, United States Code, Section 1343.

---

[10] There are numerous other false representations on the Tacopina Firm's website, unrelated to Mr. Kerik, including clients he never actually represented and successes that are wholly fabricated.

123.    That the object of such activity was to fraudulently obtain money or business, while protecting the falsely inflated reputation of Defendant Tacopina and the Tacopina Firm, at the expense of Plaintiff, Mr. Kerik.

## Racketeering Act Eleven – Obstruction of Justice Related To Attempt to Present False Criminal Charges Against Plaintiff

124.    In the most stunning and outrageous turns of events, rather than attempting to defend this lawsuit on its merits, Defendant Tacopina, through his counsel, Judd Burstein ("Burstein"), has gone back to the same federal prosecutors he cooperated with originally to ask them to arrest and charge Mr. Kerik on phony perjury charges.

125.    In his letter to Assistant US Attorneys Elliot Jacobson and Perry Carbone, Tacopina, through Burstein, misrepresents the original Verified Complaint in this action in an attempt to falsely mislead them into believing that that Mr. Kerik is now claiming innocence and that he therefore either perjured himself in his prior plea allocutions or is perjuring himself now. The letter asks prosecutors to pursue perjury charges against Mr. Kerik.  However, the logic of this letter fails because Mr. Kerik did not claim innocence in his original verified complaint, but rather that Tacopina violated his duties – a fact that is believed to be true.

126.    Moreover, this cheap litigation strategy appears to have been made in direct and flagrant violation of Rule 3.4(e) of the Rules of Professional Conduct, which provides that an attorney shall not "present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter."  As evidence of this purpose, the letter plainly states "I know that lawyers in civil litigation often try to convince prosecutors to pursue criminal cases against an opposing party, and the purpose of this letter is to do just that."[11]

---

[11] A copy of the letter is annexed hereto at Exhibit "D."

127.    Defendant Tacopina compounded his misconduct by providing a copy of this letter to a reporter from the New York Post several days before providing a copy to Plaintiff, in an effort to further defame Plaintiff.

128.    In addition to the ethical implications of Defendant Tacopina and Burstein's actions, these actions were designed to achieve at least two separate purposes.  In addition to Tacopina's and Burstein's endeavor to have false criminal charges brought against Kerik, which is offensive to the due administration of justice in the criminal proceedings, Tacopina and Burstein also sought to have Mr. Kerik incarcerated, which would absent him from the civil proceedings.

129.    By his actions, and those of others on his behalf, Defendant Tacopina has corruptly endeavored to influence, obstruct, or impede the due administration of justice, in violation of Title 18, United States Code, Section 1503.

130.    These actions were directly targeted at Plaintiff and that Tacopina's actions were the proximate cause of the injuries he sustained, in an amount to be determined at trial.

131.    These actions were premeditated to cause direct harm to the Plaintiff, Mr. Kerik.

132.    **WHEREFORE,** Plaintiff demands judgment against Defendant for

     a.    Treble damages;

     b.    Costs of the Suit, including Attorneys' fees and reasonable expenses;

     c.    Ordering Defendant to divest himself of any interest, direct or indirect in the Tacopina Firm;

     d.    Enjoining Defendant from engaging in the same type of endeavor as the Tacopina Firm – specifically the practice of law.

     e.    Ordering the dissolution of the Tacopina Firm.

## SECOND COUNT
### (Breach of Fiduciary Duty)

133.    Plaintiff repeats and reiterates each of the allegations contained in the preceding paragraphs.

134.    Upon information and belief, immediately after Mr. Kerik accepted the negotiated plea and pled guilty in state court on June 30, 2006, the DOI's lead investigator, and now Bronx prosecutor, Mr. Arsenuault sent letters to state and federal tax and law enforcement authorities, calling for investigations surrounding Mr. Kerik relating to the Bronx case.

135.    In or about July 2006, the U.S. Attorney's Office in the SDNY initiated a federal grand jury investigation involving many of the issues that had been investigated and resolved in the Bronx case.

136.    On or about March 12, 2007, the federal prosecutors involved in the grand jury investigation against Mr. Kerik served Mr. Tacopina with a grand jury subpoena, calling for the blanket production of records from his law firm relating to Bernard Kerik.

137.    As a result of this conveniently timed subpoena, Defendant Tacopina was allegedly conflicted from representing Mr. Kerik, leaving only Mr. Breen representing Mr. Kerik, who immediately notified Defendant Tacopina to preserve his attorney/client work product protections and attorney-client privileges.

138.    On information and belief, soon thereafter, Defendant Tacopina was informed that he himself was under investigation by the U.S. Attorney's Office for financial and tax crimes. Defendant Tacopina hired a lawyer to defend himself and began to engage in secret meetings with the federal prosecutors who were investigating Mr. Kerik, and provided them with information that they could use against Mr. Kerik in order to avoid prosecution himself.

139.    On information and belief, Defendant Tacopina engaged in at least five extensive proffer sessions with federal prosecutors.  These meetings went well beyond the authentication of financial records that Tacopina has falsely described them as.  Tacopina was represented by counsel at these proffer sessions, signed proffer agreements (a.k.a. "Queen-for-a-Day" agreements), and was required to discuss all issues which would constitute *Giglio*, or impeachment material against him, should he testify at Kerik's trial (i.e. his own fraudulent business records, multiple extra-marital affairs, etc.).

140.    Ultimately, Defendant Tacopina's testimony, whether true or not, provided federal prosecutors with the vital elements that they needed to be able to proceed against Mr. Kerik, as the prosecution would have been otherwise time-barred by the statute of limitations.  Thus, but for Defendant Tacopina's cooperation, Mr. Kerik would not have faced a federal conviction.

141.    Between March 2007 and November 2007, while secretly meeting with federal prosecutors, Defendant Tacopina also maintained constant contact with Mr. Kerik, assuring him a victory in his fight for justice and encouraging him to stay strong.

142.    On the morning of November 5, 2007, Defendant Tacopina requested for Mr. Kerik to meet with him at 94th Street near 23rd Avenue in Queens, New York. Defendant Tacopina then informed Mr. Kerik that Assistant U.S. Attorneys Elliott Jacobson and Perry Carbone were in the process of destroying his law practice, and that he thought he was going to lose his law license.

143.    On November 8, 2007, three days later after Defendant Tacopina informed him of his troubles with the law, Mr. Kerik was indicted by a federal grand jury, on a 16-count indictment.

144.    On November 15, 2007, Mr. Breen was provided a witness list by federal prosecutors, in which Joseph Tacopina was listed as a federal witness suggesting at least that Defendant Tacopina had provided some information to the federal prosecutors without Mr. Kerik's knowledge and contrary to his former client's liberty interests.

145.    Immediately thereafter, Mr. Breen contacted Defendant Tacopina and advised him that he was on the witness list, and that he was not to have any contact with Mr. Kerik going forward and to protect his interests.

146.    On or about December 6, 2007, it was first revealed to Mr. Kerik that Mr. Tacopina had met with federal prosecutors in secret, and divulged Mr. Kerik's privileged conversations with him related to the Bronx case.

147.    On December 17, 2007, federal prosecutors revealed that they had interviewed Defendant Tacopina, and that he confirmed statements he had made to the Bronx DA, and discussed his conversations with his client, Mr. Kerik that are privileged communications during the Bronx case.

148.    On or about January 23, 2008, Mr. Kerik's lawyers met with Defendant Tacopina and his attorney, regarding Mr. Tacopina's prior representation of Mr. Kerik, and his cooperation with the federal prosecutors**.**

149.    Defendant Tacopina's representations to Mr. Kerik are different than his representations alleged by federal prosecutors, which raises serious concerns on many levels. The statements attributed to Mr. Kerik and provided to federal prosecutors by Defendant Tacopina are teeming with credibility issues and red flags, as they were orchestrated in secret and without first informing his former client or obtaining his consent and which happened more than once, which suggests this was not an accident.

150.    At no time did Defendant Tacopina or his counsel inform Mr. Kerik about his clandestine meetings with prosecutors, or as to the information that the federal prosecutors sought, thus depriving him of the opportunity to bring the matter before the court to have an opportunity to enjoin the release of the actual statements or information Defendant Tacopina provided to federal prosecutors prior to the harm being caused.

151.    On information and belief, Defendant Tacopina intended and did produce privileged material belonging exclusively to Mr. Kerik without court order, ruling or consent but contrary to the client's direct instruction by Mr. Breen.

152.    These epic failures were not negligent but by design and were calculated to destroy or limit Mr. Kerik's ability to mount a defense of the federal charges against him that finally came on November 8, 2008 on the heels of and based on the plea in the Bronx case.

153.    As Plaintiff's attorney, Defendant had a fiduciary duty to Plaintiff. This duty survives the termination of the representation.

154.    Defendant has engaged in a continuing course of conduct from 2006 to the present of violating his fiduciary duties to the Plaintiff.  The following acts constitute the pattern of this breach:

   a.    Carelessly, recklessly, or intentionally failing to comply with accepted legal standards of practice in his false representations to Plaintiff in order to induce him to accept the negotiated plea agreement in the Bronx Case;

   b.    Acting in direct conflict with his Plaintiff's interests in engaging in several secret meetings with federal prosecutors and providing them information regarding Plaintiff to assist in their prosecution of the Plaintiff;

   c.    Failing to disclose to Plaintiff his actions with federal prosecutors, at a time when Plaintiff still believed that Defendant was acting as his attorney;

      d.        Publically defaming Plaintiff by lying regarding his cooperation with federal prosecutors in an attempt to falsely malign Plaintiff's credibility;

      e.        After the witness list was disclosed, intentionally and flagrantly jeopardizing Plaintiff's liberty and bail conditions by contacting Plaintiff;

      f.        Concealing from Plaintiff the true terms of a business deal in order to avoid equitably sharing in the profits of that agreement;

      g.        Lying to Plaintiff regarding that same agreement;

      h.        Publically defaming Plaintiff by lying regarding the same agreement and denying the fact that he called Plaintiff after the disclosure of the witness list to several media outlets from December 2013 to present, in an attempt to falsely malign Plaintiff's credibility;

      i.        Presenting, participate in presenting, or threatening to present criminal charges solely to obtain an advantage in a civil matter, through his letter to federal prosecutors in May 2014, demanding that Plaintiff be charged with perjury, or a violation of the terms of his supervised release.

155.    This continuous course of conduct by Defendant constitutes a breach of the fiduciary duty owed to Plaintiff, was careless and reckless and failed to comply with accepted standards of legal practice and further constitutes a breach of fiduciary duty to Plaintiff, and a violation of the Rules of Professional Conduct.

156.    As a direct and proximate result of the aforesaid, Plaintiff has suffered immense damages, in an amount to be determined after trial.

157.    **WHEREFORE,** Plaintiff demands judgment against Defendant for:

      f.        Compensatory damages;

      g.        Punitive damages;

      h.        Interest;

      i.        Costs of suit;

j.      Attorneys' fees and reasonable expenses;

k.      Disgorgement and return of attorney's fees paid.

### THIRD COUNT
**(Defamation)**

158.      Plaintiff repeats and reiterates each of the allegations in the preceding paragraphs as they pertain to this cause of action as though more fully set forth at length herein.

159.      Notwithstanding his federal and state convictions, Mr. Kerik enjoys a positive reputation within the community.  He has been invited to speak with numerous organizations, including the National Association of Criminal Defense Lawyers, as well as on several television programs.

160.      Tacopina's statements, together with statements made on his behalf by his attorney, Burstein, to the media regarding Plaintiff's character and truthfulness regarding matters relevant to this complaint are false.  These are extrajudicial statements, which carry no protection of immunity.  Specifically, Defendant Tacopina and his representative have made the following defamatory statements, among others:

a.  On May 19, 2014, in the New York Post article, Tacopina and his representatives wrongfully accused Mr. Kerik of committing perjury, a crime, and stated their hopes that he would be criminally charged.

b.  On May 12, 2014, in the New York Post, Tacopina and his representative falsely denied that Tacopina had cooperated with the Government against his former client and falsely stated that the notes from his multiple proffer sessions "would've shown even more evidence of Mr. Kerik's allergy to the truth."

c.  On December 29, 2013 in the New York Post, Tacopina accused Mr. Kerik of lying when Tacopina falsely denied that he knew that he was on the witness list when he called Mr. Kerik, and furthermore falsely claimed that he had spoken with prosecutors "with Kerik's blessing."

d.  On December 28, 2013, in the New York Daily News, Tacopina and his representative falsely accused Mr. Kerik of spreading "lies and innuendo,"

falsely stating that "he met with prosecutors who worked the Kerik case 'once or twice for less than two hours' primarily to authenticate financial records they had subpoenaed pertaining to a fee-sharing probe involving another attorney."

e.  On September 24, 2008, in the New York Post, Tacopina accused Mr. Kerik of lying when he falsely stated "Let me be clear: There was no client-lawyer-protected communications discussed."

f.  On May 27, 2014, Burstein, individually and on Tacopina's behalf told reporters that Kerik is a "con man" who belongs in a "sanitarium."

161.  Several of these statements impugn Mr. Kerik's professional character or state or imply that Mr. Kerik committed a crime of moral turpitude and are therefore defamation *per se.*

162.  To the extent that additional statements do not constitute defamation *per* se, Plaintiff has suffered damages as a result of these defamatory statements.

163.  WHEREFORE, Plaintiff seeks damages on this Count of the Complaint against Defendants, Individually, jointly and severally for :

a.  Compensatory damages;

b.  Punitive damages;

c.  Interest;

d.  Costs of suit; and for such other legal and equitable relief to which under the foregoing facts and circumstances he may be entitled to receive.

WHEREFORE, Plaintiff demands that a judgment be entered against Defendant TACOPINA for damages, attorneys' fees, pre-judgment interest and all other relief deemed just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury as to all issues.

Dated  June 3, 2014
       New York, New York


                            Respectfully submitted,

                            /s/ Timothy C. Parlatore

                            Timothy C. Parlatore, Esq.
                            *Attorney for the Plaintiff, Bernard B. Kerik*
                            260 Madison Avenue, 22nd Floor
                            New York, New York 10016
                            212-679-6312
                            212-202-4787 Facsimile
                            732-904-6391 Cell
                            tim@parlatorelaw.com

## **VERIFICATION**

By signing below, I swear under penalty of perjury that the foregoing statements contained in

this Amended Verified Complaint are true and correct based upon my personal knowledge

Dated: June 3, 2014
       New York, New York

_____
Bernard B. Kerik

34